MARKEL AMERICAN INSURANCE
COMPANY, Appellant,

v.

LENNAR CORPORATION, Lennar Homes of Texas Sales & Marketing Ltd., and Lennar Homes of Texas Land & Construction Ltd., Appellees.

No. 14–10–00008–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

April 19, 2011.

706

Timothy F. Lee, Houston, for appellant.

J. James Cooper, Stacy R. Obenhaus, Samantha Kay Boutte Trahan, Houston, John W. Slates, Dallas, for appellee.

Panel consists of Justices ANDERSON, SEYMORE, and McCALLY.

## OPINION

SHARON McCALLY, Justice.

Appellant Markel American Insurance Company appeals the judgment entered in favor of appellees Lennar Corporation, Lennar Homes of Texas Sales & Marketing Ltd., and Lennar Homes of Texas Land & Construction Ltd. (collectively, Lennar) after a jury trial. We reverse and render.

## I. BACKGROUND

This case presents an insurance coverage dispute on appeal from a jury verdict. The court previously considered an appeal in this cause from competing summary judgments. *See Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (*Lennar I*).[1] Lennar had a primary policy of insurance, issued by American Dynasty, with a limit of $1 million per occurrence and a self-insured retention of $1 million. Lennar purchased a commercial umbrella policy from Markel with a $25 million limit that was excess to the primary policy. The Markel policy was in effect from June 1, 1999, until October 19, 2000.

Lennar purchased Village Builders from Exxon Corporation on January 1, 1996. Beginning in 1992 or 1993, Village Builders started using Exterior Insulation and Finish System (EIFS), an imitation stucco siding product on homes it built. Because EIFS's outer surface is intended to be a moisture barrier for the siding, it does not have a secondary moisture barrier to protect underlying structures. It appears undisputed that EIFS allows the siding to trap water behind it and the materials underneath the EIFS are damaged by ongoing exposure to moisture. Village Builders built approximately 800 homes in the Houston area with EIFS, of which 400 to 500 were built after Lennar had purchased Village Builders.

In 1994, Village Builders began to experience warranty problems with EIFS. Lennar was looking for a replacement barrier product for EIFS in 1997 and decided to stop using EIFS in the first part of 1998.

Shortly after a story appeared on a *Dateline* television program in March 1999 about problems with EIFS, Lennar started receiving phone calls from concerned homeowners inquiring about EIFS. Thus began the saga of Lennar's remarkable, voluntary business plan to proact upon its EIFS issues and remediate in the interest of customer relations.

Specifically, in 1999, Lennar began contacting homeowners by letter to arrange an inspection of the EIFS. In August 1999, Lennar undertook EIFS repairs on the homes. Lennar tried to repair sixteen homes, but those homes still had moisture problems. Lennar decided to pursue a uniform course of action: Lennar would remove all of the EIFS on a home if it found it necessary to remove 60–75% of the EIFS in order to do the repair and replace it with cementious stucco. Ultimately, in the first part of 2001, Lennar decided to strip all of the EIFS off all the houses and replace it with conventional stucco. It took approximately four and

---

1. West incorrectly indicates that *Gilbert Texas Construction, L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118 (Tex.2010), abrogated *Lennar I.*

one-half years, from fall 1999 to 2003, to repair all the homes.

On January 28, 2000, Lennar first put Markel on notice that it had a potential claim regarding damage from the EIFS. Markel responded that it could not provide Lennar with a coverage analysis without additional information regarding the loss. In May 2000, Lennar sent Markel a letter listing fifty-five homes for which it was seeking coverage. In August 2000, Markel sent Lennar a reservation of rights letter. In December 2000, Lennar informed Markel that it was treating Markel's reservation of rights letter as a denial of the duty to defend and indemnify. Markel responded that its prior correspondence was a reservation of rights, not a disclaimer. Lennar continued to update Markel on the number of complaints received.

In June 2000, Lennar sued the primary carrier American Dynasty, and in February 2001, added Markel as a defendant, requesting a declaratory judgment that the carriers had a duty to indemnify Lennar for the EIFS claims. Lennar also sued Gerling America Insurance Company, RLI Insurance Company, Insurance Company of the State of Pennsylvania, United States Fire Insurance Company, United States Fidelity and Guaranty Company, and Westchester Fire Insurance Company, all of which had issued policies that Lennar claimed provided coverage.

Lennar and all the carriers moved for summary judgment on coverage. *Id.* at 661. The trial court denied Lennar's motion and granted all the insurance companies' motions. *Id.* On appeal in *Lennar I,* this court reversed the summary judgments as to Markel and American Dynasty, affirmed the summary judgments as to the other carriers, and affirmed the denial of Lennar's motions for summary judgment as to all the carriers. *Id.* at 660, 704. American Dynasty and Lennar settled pri- or to trial, leaving Markel as the only defendant at trial.

After a jury trial to determine the amount of covered property damage, the trial court awarded Lennar $2,965,114.16 in actual damages, $1,227,476.03 in pre-judgment interest, $2,171,825.98 in attorney's fees for trial, $250,000 for appeal to the court of appeals, and $100,000 for appeal to the Texas Supreme Court.

In this appeal, Markel argues, *inter alia,* that Lennar failed to apportion its covered losses from its uncovered losses, thereby precluding recovery for covered losses, and that Lennar did not establish that it was legally liable to the claimants as required to establish coverage.

## II. ANALYSIS

### A. Segregation between covered & Uncovered Losses

In its first issue, Markel contends there is no evidence that Lennar suffered a loss covered by the policy because Lennar failed to apportion or distinguish covered losses from uncovered losses. In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005). We may not sustain a legal sufficiency, or "no evidence" point unless the record demonstrates: (1) a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Id.* at 810.

■ An insured is not entitled to recover under an insurance policy unless it

proves its damages are covered by the policy. *Employers Cas. Co. v. Block,* 744 S.W.2d 940, 944 (Tex.1988), *overruled in part on other grounds by State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696 (Tex. 1996). Under the doctrine of concurrent causes, when covered and non-covered perils combine to create a loss, the insured is entitled to recover only that portion of the damage caused solely by the covered peril. *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.,* 130 S.W.3d 181, 198 (Tex.App.-Houston [14th Dist.] 2003, pet. denied); *Wallis v. United Servs. Auto. Ass'n,* 2 S.W.3d 300, 303 (Tex.App.-San Antonio 1999, pet. denied). The doctrine of concurrent causation is not an affirmative defense or an avoidance issue; rather, it is a rule embodying the basic principle that insureds are not entitled to recover under their insurance policies unless they prove their damage is covered by the policy. *All Saints Catholic Church v. United Nat'l Ins. Co.,* 257 S.W.3d 800, 802 (Tex. App.-Dallas 2008, no pet.); *Comsys Info. Tech. Servs., Inc.,* 130 S.W.3d at 198. The burden is on the insured to prove coverage. *All Saints Catholic Church.,* 257 S.W.3d at 802. The insured must present some evidence from which the jury can allocate the damage attributable to the covered peril. *Lyons v. Millers Cas. Ins. Co. of Tex.,* 866 S.W.2d 597, 601 (Tex. 1993); *Travelers Indem. Co. v. McKillip,* 469 S.W.2d 160, 163 (Tex.1971); *Comsys Info. Tech. Servs., Inc.,* 130 S.W.3d at 198; *Wallis,* 2 S.W.3d at 303. The insured must attempt to segregate the loss caused by the covered peril from the loss caused by the uncovered peril and secure a jury finding on the amount of damage attributable to the different causes. *McKillip,* 469 S.W.2d at 162; *Wallis,* 2 S.W.3d at 303. The failure to segregate covered and uncovered perils is fatal to recovery. *Comsys Info. Tech. Servs., Inc.,* 130 S.W.3d at 198; *Allison v. Fire Ins. Exchange,* 98

S.W.3d 227, 258 (Tex.App.-Austin 2002, pet. granted, judgm't vacated w.r.m.).

■ Lennar contends that Markel waived its argument that Lennar failed to segregate its covered losses from its uncovered losses by not requesting an instruction on the apportionment of covered and uncovered losses. However, Markel is not complaining of charge error on appeal. Instead, Markel is challenging the legal sufficiency of the evidence supporting the jury's answer to Question No. 1. Markel presented its objection that Lennar had not segregated its covered losses from its uncovered losses in its motion for instructed verdict, objections to the jury charge, and motion notwithstanding the verdict. *See Cecil v. Smith,* 804 S.W.2d 509, 510–11 (Tex.1991) (setting forth methods for preserving error on no-evidence challenge).

To preserve a complaint for review on appeal, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the ruling requested. TEX.R.APP. P. 33.1(a)(1). The complaining party must also show that the trial court ruled on the request, objection, or motion "either expressly or impliedly." TEX.R.APP. 33.1(a)(2)(A). The trial court expressly denied Markel's motion for instructed verdict and overruled its objections to the court's charge and impliedly overruled its motion notwithstanding the verdict by entering a final judgment in favor of Lennar. *See Chilkewitz v. Hyson,* 22 S.W.3d 825, 828 (Tex.1999); *Mangum v. Turner,* 255 S.W.3d 223, 225 (Tex.App.-Waco 2008, pet. denied). Therefore, we conclude that Markel preserved its no-evidence challenge.

■ Lennar further contends that, because Markel did not object to the charge, the legal sufficiency standard should be measured against the charge actually submitted rather than against definitions of

property damage not found in the charge. *See Akin, Gump, Strauss, Hauer & Feld v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112 (Tex.2009) ("Because there was no objection to the charge as submitted, we assume, without deciding, that the instruction was correct and measure the evidence by the charge as given."). However, as explained above, Markel objected to the submission of Question No. 1 on the basis that Lennar had not allocated the covered losses from the uncovered losses.[2] Therefore, we measure the legal sufficiency of the evidence against the definition of covered property damage set forth in *Lennar I*. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex.2002) (stating that, because the trial court submitted an erroneous definition over a proper objection, the court would measured the legal sufficiency of the evidence supporting the jury's finding by the correct definition).

■■■ Markel argues there is no evidence of covered property damage because Lennar did not segregate the costs related to the removal and replacement of EIFS as a preventative measure from costs related to the removal and replacement of EIFS where there was property damage. Question No. 1 asked the jury to determine, for each listed home, the "total amount that Village Builders incurred in payment of property damage" and further defined "property damage." Question No. 1 states, in relevant part:

> For each home on the Answer Sheet (as indicted by Job Number) state the total amount that Village Builders incurred in payment of property damage, if any, to the home.
>
> Answer in dollars and cents, if any.

Payment of "property damage" includes only the following:

- The cost to remove and replace the EIFS in order to access and repair underlying water damage or in order to determine the areas of underlying water damage.
- The cost to repair any water damage to the home.
- The cost to repair broken windows, cracked driveways, landscaping, and other parts of the home that were damaged in the course of repairing water damage to the home.

In *Lennar I*, we rejected Lennar's argument that all costs to fully remove and replace EIFS are covered property damage. *See* 200 S.W.3d at 679 ("Even if all the homes experienced water damage, we cannot conclude Lennar's costs to remove and replace all EIFS on the homes are 'damages because of ... property damage.'"). Instead, we held that costs to repair water damage to the homes and costs to remove EIFS solely to repair underlying water damage are covered property damage, while costs to remove and replace EIFS as a preventative measure are not covered property damage. *Id.* at 678 n. 3, 679. Thus, we specifically instructed that Lennar must apportion the EIFS-related damages—even on a damaged home—between its costs to remove and replace EIFS as a preventative measure and its costs to repair water damage to the homes. *Id.* at 679–80 & n. 36.

In Question No. 1 the jury was asked to state the total amount Village Builders paid for property damage to each house. Lennar introduced into evidence Plaintiffs' Exhibit No. 1A—a spreadsheet summarizing the repair costs for each house. The

---

**2.** Specifically, Markel objected to Question No. 1, in relevant part: "[U]nder the policy property damage does not include removing EIFS to determine areas of underlying water damage as the question says at the first bullet point, and thus we object to the question as being improper form."

"remedial cost" line item is, according to Daris Horn, Lennar's Regional Customer Care Manager, the "total cost to remove the EIFS, to find the damages, to repair all damages, and to reinstall the hard-coat stucco system." However, Horn also testified that "there's absolutely no way" that Lennar could find all EIFS damage without removing all the EIFS. So, through Exhibit No. 1A, Lennar asked the jury to award all costs to remove EIFS on any house that sustained damage. As such, Lennar offered no evidence of costs to remove EIFS solely on the damaged portion of each home.

In this appeal, Lennar explains that it self-apportioned; that is, Lennar omitted from its proof at trial every home that had not incurred covered property damage. Lennar removed forty-four homes from its proof prior to trial and four more homes during trial. Lennar asserts that it "allocated out" a number of homes, thereby satisfying its burden to apportion between covered and uncovered losses. Lennar contends the court's charge properly instructed the jury that the costs of removing EIFS to access and repair underlying water damage or determine the areas of underlying damage are covered property damage expenses. We disagree.

The jury charge defined "property damage," in part, as "[t]he cost to remove and replace the EIFS in order to access and repair underlying water damage *or in order to determine the areas of underlying water damage.*"[3] The removal and replacement of EIFS "in order to determine the areas of underlying water damage" as defined in the charge includes merely removing and replacing EIFS as a preventative measure, whether there was property damage or not. Thus, this definition of "property damage" does not limit the removal and replacement of EIFS "in order

to determine the areas of underlying water damages" to areas in which property or water damage was actually found. Instead, this definition improperly included the costs of the removal and replacement of EIFS for preventative measures, though we expressly held in *Lennar I* that such costs were not covered property damage. *See id.* at 677, 679.

Moreover, we specifically directed Lennar to "apportion the EIFS-related damages between its costs to remove and replace EIFS as a preventative and its costs to repair water damage to the homes." *Id.* at 679–80. This Lennar did not do. Lennar admits it did not present evidence from which the jury could allocate between costs to remove EIFS to uncover damage or as a preventative measure. *See McKillip,* 469 S.W.2d at 162 ("[T]he insureds were obligated to introduce evidence to prove and secure jury findings that the damage was caused solely by the windstorm, an insured peril; or segregating the damage caused by the insured peril from that caused by the snowstorm, an excluded peril."). Lennar's failure to do so is fatal to its recovery for covered losses. *See Comsys Info. Tech. Servs., Inc.,* 130 S.W.3d at 198; *Allison,* 98 S.W.3d at 258. Because Lennar did not sustain its burden to segregate, there is no evidence of its covered-loss damages. *See Paulson v. Fire Ins. Exch.,* 393 S.W.2d 316, 319 (Tex. 1965) (reforming court of appeals judgment to provide take-nothing judgment for insured because insured did not produce evidence which would afford reasonable basis for estimating amount of damage caused by risk covered by policy); *Wallis,* 2 S.W.3d at 304 (affirming the judgment notwithstanding verdict because the evidence was not legally sufficient to support the jury's finding on the amount of dam-

---

3. Emphasis added.

ages caused solely by the covered peril); *U.S. Fire Ins. Co. v. Matchoolian,* 583 S.W.2d 692, 694 (Tex.Civ.App.-Houston [14th Dist.] 1979, writ ref'd n.r.e.) (reversing and rendering a take-nothing judgment where the insured did not attempt to segregate damage caused by the covered peril from the uncovered peril); *State Farm Lloyds v. Kaip,* No. 05–99–01363–CV, 2001 WL 670497, at *3 (Tex.App.-Dallas June 15, 2001, pet. denied) (op. on reh'g, not designated for publication) (reversing and rendering a take-nothing judgment where the insured did not secure a jury finding on the amount of damages attributable to the covered peril because she did not attempt to segregate the damage caused by the covered perils from the uncovered perils, and the jury was never given the opportunity to consider whether the excluded perils caused a portion of the loss).[4]

Accordingly, we sustain Markel's first issue.[5]

## B. "Ultimate Net Loss"

In its second issue, Markel asserts as an independent ground for reversal that there is no evidence that Lennar was "legally obligated" to pay the claimants or that there was an adjudication, arbitration, or

settlement to which Markel agreed. Under the policy, the parties agreed that:

> [Markel] will pay on behalf of [Lennar] for that portion of *'ultimate net loss '* in excess of the 'retained limit' because of … 'property damage to which this insurance applies …

The policy defines "ultimate net loss" as follows:

> "Ultimate net loss" means the total amount of damages for which the insured is *legally liable* in payment of … "property damage," … "Ultimate net loss" may be established by *adjudication, arbitration, or a compromise settlement to which we have previously agreed in writing …* [6]

The parties agree that Lennar did not become legally liable by way of arbitration. However, Lennar argues that legal liability is established both by adjudication and by compromise settlement.[7]

### 1. Adjudication

#### i. Residential Construction Liability Act

■ At trial, Lennar claimed that it established its "ultimate net loss" or that it was "legally liable" for the repair costs under the Residential Construction Liabili-

---

4. Relying on Section 554.002 of the Texas Insurance Code, Lennar also asserts that Markel had the burden in this case to prove an exclusion or other avoidance of coverage. *See* TEX. INS.CODE ANN. § 554.002 (West 2009) (providing that the insurer has the burden of proof as to any avoidance or affirmative defense). In *Wallis,* the San Antonio Court of Appeals rejected this same argument concerning section 554.002's predecessor because the doctrine of concurrent causation is not an affirmative defense or an avoidance issue. *See* 2 S.W.3d at 303. Instead, it is a rule embodying the basic principle that the insured is entitled to recover only that which is covered under its policy, i.e., that for which it paid premiums. *Id.* at 303. Therefore, section 554.02 is inapplicable here. Under well-

settled Texas law, the insured bears the burden of segregating its covered losses from its uncovered losses. *See All Saints Catholic Church,* 257 S.W.3d at 804; *Comsys Info. Tech. Servs., Inc.,* 130 S.W.3d at 198; *Wallis,* 2 S.W.3d at 303. Therefore, Lennar had the burden to segregate its covered losses from its uncovered losses.

5. Because of our disposition on this ground, we need not address Markel's additional segregation arguments.

6. Emphasis added.

7. Lennar does not assert that it has established legal liability by any other method.

ty Act (RCLA). *See* TEX. PROP.CODE ANN. § 27.004 (West Supp. 2009).[8] Lennar submitted two jury questions, over Markel's objection, to show that it was legally liable to pay the homeowners' claims. Question No. 6 of the charge asked whether the construction defect created an imminent threat to the health and safety of the inhabitants of the homes. Question No. 7 asked whether Village Builders took reasonable steps to cure the construction defect as soon as practicable and within a reasonable time. The jury answered each question in the affirmative. Markel moved for the trial court to disregard the jury's answers.

■■■■■ Markel argues that the jury's answers to Question Nos. 6 and 7 should have been disregarded because there is no evidence to support its answers and the RCLA issue is immaterial. A trial court may disregard a jury finding only if there is no evidence to support the finding or if the issue is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex.1994); *Hall v. Hubco, Inc.*, 292 S.W.3d 22, 27 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). A question is immaterial when it should not have been submitted or was properly submitted but has been rendered immaterial by other findings. *Spencer*, 876 S.W.2d at 157; *Hall*, 292 S.W.3d at 27.[9]

■■■■■ Markel contends the jury's affirmative answers to Question Nos. 6 and 7 do not prove that Lennar was legally liable to pay under the RCLA because the statute does not create a cause of action. *See* TEX. PROP.CODE ANN. § 27.005 (West 2000) ("This chapter does not create a cause of action or derivative liability or extend a limitations period."); *see also Gentry v. Squires Constr., Inc.*, 188 S.W.3d 396, 404 (Tex.App.-Dallas 2006, no pet.); *Branton v. Wood*, 100 S.W.3d 645, 646 n. 1 (Tex. App.-Corpus Christi 2003, no pet.); *Sanders v. Constr. Equity, Inc.*, 42 S.W.3d 364, 370 (Tex.App.-Beaumont 2001, pet. denied). Instead, the RCLA modifies causes of action for damages resulting from defects in residences by limiting and controlling causes of action that otherwise exist. *Gentry*, 188 S.W.3d at 404; *Branton*, 100 S.W.3d at 646 n. 1; *Sanders*, 42 S.W.3d at 370.

Lennar admits the RCLA does not create an independent cause of action, but

8. Lennar relies on Section 27.004(m) of the RCLA in support of its position that it is legally liable to pay. Section 27.004(m) provides that a homebuilder, who receives written notice of a construction defect creating an imminent threat to the health or safety of the inhabitants of the residence, "shall take reasonable steps to cure the defect as soon as practicable." TEX. PROP.CODE ANN. § 27.004(m). If the homebuilder "fails to cure the defect in a reasonable time, the owner of the residence may have the defect cured and may recover from the contractor the reasonable cost of the repairs plus attorney's fees and costs in addition to any other damages recoverable under any law not inconsistent with the provisions of this chapter." *Id.*

9. Lennar argues that Markel waived error on appeal. Markel preserved its no-evidence challenge in its objections to the jury charge, which the trial court expressly overruled, motion for directed verdict, which the trial court expressly denied, and motion to disregard, which trial court impliedly overruled when it entered judgment in favor of Lennar. *See* TEX.R.APP. P. 33.1(a)(2)(A) (providing that error is preserved when the trial court ruled on the motion either expressly or impliedly); *Chilkewitz*, 22 S.W.3d at 828 (holding that the trial court impliedly overruled a motion for judgment notwithstanding the verdict by rendering judgment); *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 448 n. 26 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (construing the appellants' objection to the proposed judgment and own motion for the entry judgment as motions for JNOV or to disregard jury findings and holding that error was preserved by the trial court's implicit overruling of their objections and motion).

argues that it creates obligations imposed by law. Even if the RCLA could apply to any causes of action against Lennar, these findings do not establish that Lennar was legally liable to pay any claims. There was no adjudication of any claims to which the RCLA could apply because Lennar had settled whatever potential claims the homeowners may have had. Hypothetical claims do not establish that Lennar is legally liable to pay under the policy. Because there is no evidence that Lennar was legally obligated to pay under the RCLA, the trial court should have disregarded the jury's answers to Question Nos. 6 and 7. *See Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.,* 585 F.3d 662, 673 (2d Cir.2009) (holding that the insured's "legal liability" was not established by adjudication under identical policy language where the insured was not a party to the underlying lawsuit and no judgment was entered against the insured, and consequently "ultimate net loss" also could not be established).

### ii. Defective Product

■ Lennar further claims in this appeal that it was "legally liable" for using a defective product—EIFS. Lennar asserts that it is legally liable for harm proximately caused by the use of EIFS in the construction of the homes if there was a safer alternative design and the defect was a producing cause of property damage for which the homeowner sought recovery. *See* Tex. Civ. Prac. & Rem.Code Ann. § 82.005(a) (West 2011). Lennar states that Question No. 1 did not include the "legally liable" component, i.e., that Lennar used a defective product, but it did ask the basic coverage issue. Lennar asserts that, because Markel did not object to the omission of this "legally liable" component or request submission of an appropriate definition, a finding that Lennar is legally liable for using a defective product is

deemed found by the trial court in support of the judgment if there is factually sufficient evidence to support it. *See* Tex.R. Civ. P. 279.

Even if there were a deemed finding on liability for use of EIFS, there was no defective product claim against Lennar because the homeowners were not part of this lawsuit; Lennar had already settled any potential claims the homeowners might have had against it. As Markel points out, Lennar was not trying to prove a product defect claim against itself. In the absence of adjudication on any claim for the use of a defective product, there is no evidence of legal liability or "ultimate net loss."

### 2. Settlement Agreements

■ Lennar also argues that the settlement agreements with the homeowners establish its legal liability by imposing a contractual obligation to repair water damage to the homes as a result of the use of the EIFS. It is undisputed that Lennar entered into a settlement agreement with each homeowner. The contract provides that Markel will pay on behalf of Lennar that portion of the "ultimate net loss" of the retained limit because of property damage to which the policy applied. Under the policy, one way to establish "ultimate net loss" is by "a compromise settlement to which [Markel has] previously agreed in writing." Markel argues that the settlement agreements do not establish "ultimate net loss" because Markel did not agree to the homeowner settlement agreements in writing. It is, in fact, undisputed that Markel did not consent in writing to Lennar's settlement of the homeowners' claims.

Lennar contends that Markel's lack of consent is immaterial because Markel did not show that it was prejudiced by Len-

nar's settlement of the homeowner's claims without Markel's consent. Question No. 9 asked, "Was Markel prejudiced by Village Builder's failure to obtain Markel's consent: (a) to enter into any compromise settlement agreement, or (b) to voluntarily make any payment, assume any obligation, or incur any expense?" The jury found that Markel was not prejudiced by the settlements without consent. As explained below, Markel was not required to establish prejudice in order to rely upon the "compromise settlement" provision of ultimate net loss.

Condition E of the policy also contains a settlement-without-consent provision, which states, in relevant part, that it is a requirement that "no insured, except at their own cost, voluntarily make any payment, assume any obligation, or incur any expense, other than for incidental first aid, without our consent." Lennar was required under Condition E to obtain Markel's consent before settling the homeowners' claims. In *Lennar I*, we held that an insurer cannot rely on a settlement-without-consent *condition* to avoid coverage unless the insurer suffers prejudice; we further held that Markel had presented no summary judgment evidence that it was prejudiced by Lennar's violation of Condition E. *Lennar I*, 200 S.W.3d at 695.

However, Markel is not complaining in this issue about Lennar's failure to comply with Condition E, an issue we addressed in *Lennar I*. Instead, Markel is complaining about Lennar's failure to obtain Markel's written consent prior to settling the homeowners' claims under "ultimate net loss." A compromise settlement to which Markel agreed in writing is one of the ways to establish "ultimate net loss." This is the definition of coverage under the policy. It

is not merely a condition. Therefore, Markel was not required to establish that it was prejudiced by Lennar's settling the homeowners' claims without Markel's written consent.[10]

Lennar contends the prejudice requirement applies no matter where the settlement-without-consent language is found in the policy. Otherwise, according to Lennar, an insurer could avoid liability by strategically placing its settlement-without-consent language not only in the policy "conditions," but in other parts of the policy such as the definition of "ultimate net loss."

 When analyzing an insurance contract, we are guided by the well-established principles of contract construction. *Mid–Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 154 (Tex.2010). Our primary goal is to determine the parties' intent through the policy's written language. *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex.2009). We must read all parts of the contract together, giving effect to each word, clause, and sentence, and avoid making any provision within the policy inoperative. *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex.2010). We give policy language its plain, ordinary meaning unless something else in the policy shows the parties intended a different, technical meaning. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex.2009). Our analysis is confined within the four corners of the policy itself. *Page*, 315 S.W.3d at 527. A plain reading of the policy shows that the parties intended to define the scope of the policy's coverage by requiring Lennar to obtain Markel's written consent before settling any

---

**10.** In its third issue, Markel contends Lennar's violation of the settlement-without-consent provision found in Condition E resulted in prejudice to Markel. Given our disposition, we need not address this issue.

claims. In construing a policy, we may not rewrite the policy or add to its language. *Am. Mfrs. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 162 (Tex.2003).

 Lennar further contends Markel waived strict compliance with the settlement-without-consent condition. This argument is similarly unavailing because this requirement is a part of the definition of coverage. Waiver may operate to avoid forfeiture of policy and may prevent an insurance company from avoiding payment because of the failure on the part of the insured to comply with some requirement. *Minn. Mut. Life Ins. Co. v. Morse,* 487 S.W.2d 317, 320 (Tex.1972). However, waiver cannot be used to rewrite an insurance policy and create coverage where none exists. *Ulico Cas. Co. v. Allied Pilots Ass'n,* 262 S.W.3d 773, 779, 780 (Tex.2008); *Tex. Farmers Ins. Co. v. McGuire,* 744 S.W.2d 601, 602–03 (Tex. 1988); *Morse,* 487 S.W.2d at 320. Because Markel did not agree to the settlement agreements, Lennar cannot establish "ultimate net loss."

Accordingly, we sustain Markel's second issue.

### III. CONCLUSION

Accordingly, having sustained Markel's first two issues, we reverse the trial court's judgment and render judgment that Lennar take nothing on its claims against Markel.[11]

---

**11.** Because of our disposition, we need not address the other issues Markel raised in this appeal.