# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 4, 2013

No. 11-20912

Lyle W. Cayce
Clerk

GBP PARTNERS, LIMITED,
doing business as
Gulfbrook Plaza Shopping Center,

Plaintiff-Appellant

v.

MARYLAND CASUALTY COMPANY,

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:10-CV-4228

Before JONES, GARZA, and PRADO, Circuit Judges.

EDITH H. JONES, Circuit Judge:[*]

In September 2008, Hurricane Ike made landfall near Galveston, Texas, devastating most of the Texas coastline and becoming the costliest hurricane in Texas history. A shopping center owned by Appellant GBP Partners, Limited ("GBP") and insured by Appellee Maryland Casualty Company ("Maryland Casualty") was severely damaged by the storm. Maryland Casualty paid to replace the center's roof but denied other claims for coverage submitted by GBP,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-20912

and GBP sued in Texas state court. The case was removed to the federal court for the Southern District of Texas, and the district court granted summary judgment to Maryland Casualty on all of GBP's claims. GBP appeals the district court's decision. We AFFIRM in part and REVERSE and REMAND in part.

## BACKGROUND

After removing this case to federal court based on diversity of citizenship, Maryland Casualty filed a no-evidence motion for summary judgment, and the district court granted summary judgment in favor of the insurer on all issues.

GBP's business is to own and rent space in Gulfbrook Plaza. GBP has no employees. GBP Plaza L.L.C. is GBP's general partner. HSA Commercial Realty Services, L.L.C. (and, previously, a predecessor entity) (collectively, "HSA"), is a commercial property management company that manages Gulfbrook. Hardam Azad is a 19% limited partner in GBP, the 100% owner of GBP Plaza L.L.C., and a 90% owner of HSA.

Hurricane Ike struck Gulfbrook on September 13, 2008. GBP submitted a claim to Maryland Casualty, and after investigation Maryland Casualty paid GBP over $2,300,000 on its claim for roof damage. Maryland Casualty rejected claims for lost rents, management fees, additional roof damage, and window damage, however.

The roof damage and loss of electricity at Gulfbrook caused some of the tenants to close their stores for weeks after the hurricane. The shopping center itself was closed for about two weeks. Azad offered a twenty-five percent reduction in rent to Gulfbrook tenants for six months in an effort to encourage them to stay at Gulfbrook. Gulfbrook's largest tenant, Affordable Furniture, had not paid rent for sometime before the hurricane and did not pay rent afterward.

The damage to the roof required it to be completely replaced. Disputes between GBP and the roofing companies, disputes between GBP and Maryland Casualty, and delays by GBP in sending Maryland Casualty documents resulted

in walk-offs by two roofing contractors and extended the roof replacement to over two years. Significantly, a dispute between GBP and its general contractor MRCO, Inc. ("MRCO") led MRCO to refuse to endorse a check from Maryland Casualty issued as jointly payable to both (as well as to GBP's lender and GBP's public adjuster). Azad forged MRCO's endorsement and deposited the check. After MRCO filed an affidavit of forgery with Maryland Casualty on April 5, 2010, Maryland Casualty indicated to GBP a desire to interplead funds in the future. GBP refused to execute a proof of loss while Maryland Casualty continued to consider interpleading the funds. Work stopped in early May after the second roofing company walked off the job. When GBP ultimately executed a proof of loss for approximately $1 million on June 29, 2010, Maryland Casualty issued a final check on July 26, 2010.

Well over two years after Hurricane Ike, GBP commissioned a storefront window damage report, which alleged that the damage was consistent with a "prolonged wind event" like a hurricane.

## STANDARD OF REVIEW

We "review[ ] the district court's grant of summary judgment *de novo*, applying the same standards as the district court." *Depree v. Saunders*, 588 F.3d 282, 286 (5th Cir. 2009). Summary judgment is warranted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Id.* A motion for summary judgment cannot be defeated "by submitting an affidavit which directly contradicts, without explanation, [an affiant's] previous testimony." *Powell v. Dallas Morning News, L.P.*, 776 F. Supp. 2d 240, 246–47 (N.D. Tex. 2011).

Under controlling Texas law, GBP has the burden of establishing that each of its claims was covered under the Policy. *Markel Am. Ins. Co. v. Lennar Corp.*, 342 S.W.3d 704, 708–09 (Tex. App.—Houston, 2011, pet. filed). "When covered

and non-covered perils combine to create a loss, the insured is entitled to recover only that portion of the damage caused solely by the covered peril." *Id.* at 709. A failure to establish the amount of loss attributable to covered peril—as opposed to uncovered peril—is fatal to recovery. *Id.*

As an insurance policy is a contract, the overall agreement must be evaluated to determine the purposes the parties had in mind at the time they formed the contract. *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 841 (Tex. 2010). "Terms in insurance contracts that are subject to more than one reasonable construction are interpreted in favor of coverage." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010) (citation omitted). "However, courts should not strain to find an ambiguity, if, in doing so, they defeat the probable intentions of the parties, even though the insured may suffer an apparent harsh result as a consequence." *Quality Oilfield Prods., Inc. v. Mich. Mut. Ins. Co.*, 971 S.W.2d 635, 637 (Tex. App.—Houston, 1998).

## DISCUSSION

On appeal, GBP challenges the district court's grant of summary judgment to Maryland Casualty on the following disputed claims. We reverse and remand in part the district court's decision in regard to lost rent. We affirm the denial of management fees, roof damage, and window damage.

### I.    Lost Rents

GBP submitted a claim to Maryland Casualty for rents lost when tenants were offered a six-month rent abatement in an effort to retain them as tenants and for an anchor tenant that was not offered a rent abatement, but that nonetheless was unable to pay its rent and eventually closed. The district court held that GBP could not show a "suspension of operations," that the rent reductions would not qualify as "extra expense" because they were not "necessary costs," and that losses due to the loss of power were not covered. GBP

argues on appeal that the closure of the shopping center qualified as a "suspension of operations," that no suspension of operations need be shown to recover "extra expense," and that the rent abatements were required to mitigate loss. Maryland Casualty reiterates the arguments accepted by the district court and argues that GBP failed to establish causation.

## A.    Suspension of Operations

The Policy states that Maryland Casualty "will pay for the actual loss of 'business income' [Gulfbrook] sustain[s] due to the necessary suspension of 'operations' during the 'period of restoration,' but not to exceed 12 consecutive months." (R. at 551.) "Operations" is defined by the Policy as the "business activities occurring at [Gulfbrook]." (R. at 563.) It is undisputed that GBP is in the business of owning and renting shopping center space. It is also undisputed that at least some of the tenants at Gulfbrook continued to pay rent, including one that continued to pay rent with no abatement. Under Texas law, a suspension of operations clause requires business to have completely ceased for some interval. *See, e.g.*, *Apartment Movers of Am., Inc. v. One Beacon Lloyds*, No. 05-10354, 2006 WL 678675, at *1 (5th Cir. Mar. 16, 2006) (requiring complete interruption where the policy required a "necessary suspension of your operations"); *H & H Hospitality LLC v. Discover Specialty Ins. Co.*, No. H-10-1886, 2011 WL 6372825, at *3 (S.D. Tex. Dec. 20, 2011) (requiring complete interruption where the policy required a "necessary suspension of your 'operations'"); *Quality Oilfield Prods.*, 971 S.W.2d at 638–39 (requiring complete interruption where the policy required a "necessary interruption of business"). GBP never ceased its operations, nor has it proved or established a material question of fact as to whether there was a complete suspension of operations at the center.

No. 11-20912

## B.  Necessary Extra Expense

The Policy also covers any "necessary 'extra expense'" GBP incurred "during the 'period of restoration' that [GBP] would not have incurred if there had been no direct physical loss of or damage to such property caused by or resulting from a Covered Cause of Loss." (R. at 551.) "Extra expense" is defined by the Policy as "necessary costs incurred to . . . [a]void . . . the suspension of business and continue 'operations.'" (R. at 563.)  The "period of restoration" begins with "the date of the direct physical loss or damage caused by or resulting from any Covered Cause of Loss" and ends on the "date when the property . . . should be repaired, rebuilt or replaced." (R. at 564.)  The Policy covers not just extra expense associated with a suspension of operations but extra expense necessary to *avoid* the suspension of operations.  GBP argues just such a purpose behind the rent abatements.[1]  The rent abatements were, according to Azad's evidence, designed to prevent a possible closure of the entire shopping center caused by an exodus of tenants due to the hurricane damage.  This created a genuine issue concerning the business necessity of the abatements.[2]

## C.  Covered Loss

GBP must still establish that the extra expense was due to a covered loss. Power loss is not covered "if the failure occurs away" from Gulfbrook, "however caused." (R. at 546.)  GBP did not submit any evidence of this type of power loss. GBP submitted an affidavit from Azad stating that even if the power had not failed, GBP would have had to close the building due to the roof damage. (R. at 1297.)  Maryland Casualty argues that this affidavit conflicts with previous sworn statements Azad made during his deposition.  On the contrary, Azad's

---

[1] The Policy only covers extra expense during the period of restoration.  The period of restoration, though, is tied not to a suspension of operations but to the date of a covered loss.

[2] Maryland Casualty cites no authority for its apparent proposition that such rent abatements must be contractually obligated.

later affidavit does not directly contradict his deposition testimony. Azad's affidavit is in agreement with his deposition testimony: both the electrical outage and the roof damage affected operations.[3]

GBP did not establish how long the shopping center or parts of it were closed beyond an admittedly unverifiable statement that individual tenants may have been closed between two and four weeks. (R. at 336.) Although GBP did not submit additional evidence in support, a sworn affidavit, especially given that it is undisputed that Gulfbrook sustained significant roof damage from Hurricane Ike, is sufficient to create a genuine dispute of material fact as to whether the extra expense was due to the roof damage. Similarly, Azad's affidavit is sufficient to establish a genuine dispute of material fact as to whether the roof damage was sufficient by itself to necessitate closing all or part of the shopping center, regardless of any power loss. Accordingly, we reverse and remand to the district court on the question whether the rent abatements were a "necessary extra expense" due to a "covered loss."

**D. Affordable Furniture**

GBP did not submit evidence that it incurred an extra expense to avoid a suspension of operations tied to Affordable Furniture. GBP made no change to its informal policy regarding Affordable Furniture after Hurricane Ike. Rather, it continued its existing practice of allowing Affordable Furniture to pay rent late. Absent a suspension of operations or an expense tied to an attempt to avoid a suspension of operations, there is no covered loss. Accordingly, the district

---

[3] Azad replied "Yes" when asked if Gulfbrook "suspended operations for two weeks due to the loss of electricity[.]" (R. at 335.) But in answering the very next question (regarding the exact period operations were suspended), Azad referenced a roof that was "totally compromised." *Id.* Shortly thereafter, Azad states that "even when [Gulfbrook's tenants] are open, they are continue [sic] to sustain damages because the roof is constantly leaking." *Id.* In his affidavit, Azad states that "[e]ven if portable electrical generators had been brought into the property, the roof damage itself caused a total suspension of operations." (R. at 1297.)

court correctly granted summary judgment to Maryland Casualty for lost rents from Affordable Furniture.

## II.    Management Fees

As GBP had no employees, it paid HSA (and an HSA-predecessor company) to manage its properties.  A new management agreement was signed on January 1, 2009, shortly after Hurricane Ike struck.[4]  The new management agreement raised HSA's compensation for work on insurance claims from $75 to $100 an hour.  (R. at 2012.)  Maryland Casualty refused to pay GBP's claim for these fees, and the district court granted Maryland summary judgment on the basis that the Policy did not cover that type of work and the fees were not an extra expense because there was no suspension of operations.  GBP argues that some of the fees fall within the component of business income coverage for "[c]ontinuing normal operating expenses" and some of the fees were a covered "extra expense."  Maryland Casualty responds that the new agreement was not necessary to obtain the repairs or negotiate insurance matters, and the management fees are not a proper business income claim.  We agree with Maryland Casualty.

First, the Policy only covers "[c]ontinuing normal operating expenses incurred," (R. at 562), if there is a suspension of operations.  Because no suspension of operations occurred, the recurring management fees cannot be fully recoverable.

Second, GBP offered no evidence explaining what portion of the fees directly related to making emergency repairs and securing recovery from insurance claims or legal proceedings.  As explained above, GBP can recover as extra expense *only* costs necessary to avoid a suspension of operations. Although its brief mentions "emergency repairs (necessary to protect the property or safety

---

[4] As owner of GBP's general partner and majority owner of HSA, Azad signed for both parties.

of tenants)" and that "management fees necessary to initiate and manage the repair process were incurred by GBP during the period of restoration and would not have been incurred had there been no property damage from a covered cause," (Appellant's Br. 17–18), GBP did not submit evidence tying fees directly to its efforts to prevent a suspension of operations due to an exodus of tenants, as opposed to non-covered costs. On the contrary, GBP references those management fees in conjunction with fees directly related to non-covered costs.[5]

## III.  Roof Damage

Gulfbrook's roof sustained additional damage due to delays in its replacement. GBP was also unable to obtain a warranty on the new roof and sought recovery of the loss in warranty value. Maryland Casualty refused to pay for either. The district court agreed with Maryland Casualty that GBP caused the delay that led to the damage. The relevant facts are undisputed.

MRCO served as GBP's initial roof contractor. GBP fired MRCO on October 9, 2009 after a dispute. Maryland Casualty's third check to GBP for the roof claims was issued on October 6, 2009, and GBP apparently did not receive it until after firing MRCO. Like the first two checks, this check was jointly payable to GBP, MRCO, GBP's lender, and GBP's public adjuster. When MRCO refused to endorse the check, Azad forged MRCO's endorsement and deposited

---

[5] "[C]onsiderable time has been (and remains to be) expended on GBP's behalf to find, evaluate, hire, and oversee the public adjusters, contractors, attorneys, and others needed to work through the process of identifying and estimating the costs to repair the damage, compiling the information necessary to pursue the insurance claims, and conducting the repair work." (Appellant's Br. 17.)

GBP also fails to cite any authority in support of the proposition that the management fees are not an excluded "other consequential loss." *Contra Southeast Real Estate Invest. Corp. v. Nationwide Mut. Ins. Co.*, No. 1:07cv1197, 2008 WL 4939748, at *5 (S.D. Miss. Nov. 17, 2008) (holding that percentage management fees were "'unquestionably' any other consequential loss"). The discussion in GBP's reply brief about consequential damages is inapposite because it deals entirely with damages from a breach, and GBP does not allege that the management fees were incurred because of a breach of contract by Maryland Casualty. (Appellant's Reply Br. 6–7.)

the check. MRCO provided an affidavit of forgery to Maryland Casualty on April 5, 2010, and Maryland Casualty informed GBP it would need to file an interpleader. Maryland Casualty ultimately never did so. GBP, GBP's public adjuster, and Maryland Casualty continued to work together, and Maryland Casualty sent GBP a proposed proof of loss on May 5, 2010. GBP's second roofing contractor walked off the job in early May of 2010. GBP did not execute a proof of loss until June 29, 2010. Maryland Casualty issued a check based on the proof of loss within the thirty-day time frame required under the Policy.

GBP argues that the additional damages to the roof resulted from those delays. Many of the delays were caused by GBP. GBP argues, however, that Maryland Casualty is nonetheless responsible for GBP's own dilatory actions because Maryland Casualty considered interpleading further payments after GBP's principal forged an endorsement on a check issued by Maryland Casualty, and GBP was thus justified in not executing a proof of loss to avoid an interpleader. Even interpreting the facts in the light most favorable to GBP as the non-movant, the district court correctly granted Maryland Casualty summary judgment on this issue. Also, because, by GBP's own admission, the loss of warranty value was caused by the delays to the roof replacement, the question of whether the loss warranty value would have otherwise been covered need not be reached. Maryland Casualty did not breach its payment obligation.

## IV. Window Damage

GBP's consultant did not inspect the windows at Gulfbrook until early 2011, and GBP did not file a proof of loss for the alleged window damage until June of 2011. Maryland Casualty then performed its own inspection and denied GBP's claim. The district court granted summary judgment for Maryland Casualty because GBP did not provide timely notice of loss or create a genuine

No. 11-20912

issue that the damage to the windows was caused by Hurricane Ike rather than a non-covered peril.[6]

Regardless of the timeliness of its notice, GBP's claim for window damage must fail because GBP did not offer evidence to establish what part of the damage to the windows was caused by Hurricane Ike as opposed to some other non-covered event. *Markel*, 342 S.W.3d at 709. Moreover, GBP has waived the argument by inadequately briefing the issue on appeal. *See* FED. R. APP. P. 28(a)(9)(A); *Beaumont*, 972 F.2d at 563. An allegation of allocation without further explanation than this: "the wear and tear, etc., are the part that did not require replacement; the hurricane damage is the part that did"–is insufficient as a matter of law. (Appellant's Reply Br. 9–10.)[7]

## CONCLUSION

The district court did not err in granting summary judgment in favor of Maryland Casualty on any issue other than the rent abatements. Accordingly, we AFFIRM the judgment on all other issues and REVERSE and REMAND to the district court for further proceedings in connection with the rent abatement.

---

[6] The Policy excludes damage resulting from wear and tear, deterioration, hidden or latent defect, settling, cracking, shrinking expansion, continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more. (R. at 546-48.)

[7] GBP raised a number of non-contractual issues to the district court and sought extra-contractual damages. The district court granted GBP summary judgment on all of these issues, and GBP chose not to argue them on appeal. Failure to raise an issue on appeal constitutes waiver of that argument. United States v. Thibodeaux, 211 F.3d 910, 912 (5th Cir. 2000); Yohey v. Collins, 985 F.2d 222, 224–25 (5th Cir. 1993).

11