

## NUMBER 13-13-00235-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**SUPERIOR CRUDE GATHERING, INC.,**                             **Appellant,**

**v.**

**ZURICH AMERICAN INSURANCE COMPANY,**                        **Appellee.**

**On appeal from the 319th District Court
of Nueces County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Rodriguez**

This appeal of a summary judgment involves a question of insurance coverage.

Appellant Superior Crude Gathering, Inc.'s (Superior Crude) sole issue is whether the trial

court properly granted summary judgment, ruling that an insurance policy (the Policy)

issued by appellee Zurich American Insurance Company (Zurich) to Superior Crude did

not cover Superior Crude's claims.   We affirm.

## I. BACKGROUND

On February 9, 2010, Superior Crude trucks unloaded oil into Tank 13 at its Ingleside, Texas terminal.   Superior Crude reported crude oil leaking from that aboveground storage tank (the Event, oil spill, or oil release) on or about that day. Superior Crude notified Zurich of the oil release and requested insurance coverage.

Under the Policy, Zurich provided Superior Crude with the following forms of insurance coverage that were effective during the relevant time:   (1) Commercial General Liability (CGL) Coverage; and (2) Truckers Coverage.   Zurich denied Superior Crude's claim for coverage under both forms of insurance.   Superior Crude does not challenge the denial of the CGL coverage; it does challenge Zurich's denial of the Truckers Coverage.

Section II.A of the Truckers Coverage part of the Policy, a section referred to as the insuring agreement, provided Superior Crude with the following liability coverage:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."
>
> We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos."

The Truckers Coverage excluded from this liability coverage, among other things, the following:   (a) pollution, found at subsection II.B.11,[1] and (b) "'[p]roperty damage' to or

---

[1] Subsection II.B.11, titled "Pollution," excluded, in relevant part, coverage for the following:

2

'covered pollution cost or expense' involving property owned or transported by the 'insured' or in the 'insured's' care, custody or control,'" at subsection II.B.6.[2]  However, the Truckers Coverage modified its liability coverage and exclusions for pollution claims through its "Pollution Liability—Broadened Coverage for Cover Autos—Business Auto, Motor Carrier and Truckers Coverage Forms" (PLBC) endorsement.  First, the PLBC endorsement set out that subsection II.B.11, the total pollution exclusion, did not apply to the Truckers Coverage; instead, that exclusion applied "only to liability assumed under a contract or agreement."  Second, the PLBC endorsement provided that subsection II.B.6, the care, custody, or control exclusion, did not apply to the coverage for transport and storage of pollutants.  In other words, the PLBC endorsement expanded pollution coverage by limiting or eliminating aspects of the pollution exclusions found elsewhere in the body of the Policy.

After Zurich denied its claim, Superior Crude filed suit.  In relevant part, Superior Crude sought a declaratory judgment to construe this coverage.  It also asserted, among other things, breach of contract and violations of the Texas Insurance Code and the Texas

---

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a.　　　That are, or that are contained in any property that is:

　　　(1)　　　Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

　　　(2)　　　Otherwise in the course of transit by or on behalf of the "insured"; or

　　　(3)　　　Being stored, disposed of, treated or processed in or upon the covered "auto" . . . .

[2] The Policy titled this exclusion "Care, Custody or Control."

3

Deceptive Trade and Practices Act.

On August 13, 2012, Zurich and Superior Crude each filed a traditional motion for summary judgment. In its motion, Superior Crude argued that the PLBC endorsement provision of the Truckers Coverage provided expanded coverage in this case. It urged that "[b]y virtue of this endorsement, there was no longer a pollution exclusion under the Truckers [C]overage for the escape of pollution that was . . . in the course of transit by or on behalf of [Superior]."

Superior Crude supported its "in transit" coverage argument with the June 4, 2012 affidavit of Jeff Kirby, the owner of Superior Crude. In his affidavit, Kirby stated that

> Superior [Crude] purchased and took title to the oil at the well head in the field. The oil was then transported by tanker trucks. The oil that is the subject of the Event was still owned by Superior [Crude]. It was still in Superior [Crude's] possession at the time of the Event. The oil had not been finally delivered, disposed of, nor—given its monetary value—abandoned by Superior [Crude]. It was still in transit by Superior [Crude]. It was being temporarily stored until it could be loaded onto marine barges to be moved up the inland waterway to the Port of Texas City and Nederland where it would be finally delivered and sold to Superior's customers BP and Sunoco, respectively. However, before it could be finally delivered and sold to BP and Sunoco, the Event occurred.

In response to Superior Crude's motion, Zurich claimed that Superior Crude did not meet its burden of proving that coverage existed under the Policy. It asserted that Superior Crude's interpretation was incorrect because "it ignore[d] the requirements of the insuring agreement."

Zurich's traditional motion for summary judgment argued, among other things, that Superior Crude was not entitled to coverage because the oil release did not result from the "ownership, maintenance or use" of a covered auto under the insuring agreement.

4

Zurich argued that in this case there was "no nexus to a covered vehicle at all" and that "Superior [did not] claim that a covered vehicle caused, produced, or contributed to the Oil Release."

In support of its motion, Zurich attached evidence showing that Superior Crude had determined that the cause of the release was collapse or subsidence of the floor in the storage tank, resulting in a crack in the tank floor that allowed oil to leak out. Zurich also attached the following witness affidavit that Superior Crude produced during discovery:

> I [am] Ralph Bubba [G]amble . . . , whose occupation is the South West Texas Regional Manager for BBB Tank Services, Inc. I have been in this area for 11 years. I certify that the reason for the failure bottom plate on tank 13 located in Ingleside Texas at the Falcon Refinery, was caused by several holes in the bottom plate causing the sand erosion that lead up to catastrophic failure of the two lap welded seams located on the East North East section of the tank in-between the clean out door and the man-way to crack and give way. The plates after taken out of the tank were photographed and visual testing was performed. Also the last inspection report showed that there were several arcas [sic] of the underside of the floor bottom that had been loss of metal thickness, which help speed up the process and lead to the pin holes thru-out the tank. Mostly the larger holes are located on the East North East side of the tank.

In response to Zurich's position that the insuring agreement provision applied, Superior Crude asserted that "loading and unloading" were incorporated into the definition of "use" for purposes of coverage under the Policy. It argued that "[t]he pollution expenses Superior [Crude] incurred as a result of the rupture of the bottom of Tank 24 arose out of, and resulted directly from—and during—the unloading of the Superior-owned oil from the Superior-owned trucks into Tank 13." Superior Crude supported this position with Kirby's second affidavit dated August 23, 2012, which set out, in relevant

5

part, the following:

5. . . . . This oil was in the process of being unloaded from the tanker trucks . . . into Tank 13 at Superior's Ingleside facility immediately before, during, and immediately following the discovery of the leak in Tank 13. Due to the nature of the failure of the bottom of Tank 13, the precise moment of the rupture is incapable of being known.

. . . .

7. The oil that Superior [Crude] purchases in the field, transports to the Ingleside terminal, and then unloads into Tank 13 contains naturally occurring salt water. Because the salt water is heavier than oil, it will sink to the bottom of the tank when the oil is unloaded into the tank. Due to the corrosive nature of the salt water, combined with the electrolysis of salt on steel, there is additional, naturally occurring corrosion to the bottom of the plates. That is why the plates are routinely and periodically inspected.

8. Following the failure of the bottom of Tank 13, and after the tank was emptied, I participated in an inspection which revealed that tiny pin holes had developed in various locations on plates comprising the floor of Tank 13. These holed [sic] allowed the salt water to escape undetected out of the bottom of the tank. The salt water then, in turn, created pockets or voids in the sand that had been supporting the tank bottom. As [a] result of the voids underneath the tank bottom/floor, as the tank was filled with oil during the unloading process from the trucks, the weight of the additional oil on the now "unsupported" tank bottom caused the tank bottom to subside and "sink" in the voids that had been created. This resulted in stress on the lap weld seams of the ["overlapping"] plates comprising the tank bottom. As a result of the oil being unloaded into Tank 13 on February 9, 2010, the additional weight of the oil being unloaded from the trucks into Tank 13 placed stress on the weakened tank floor bottom to the point that the weight exceeded the weight-bearing capacity of the tank floor. The tank floor then suddenly and catastrophically ruptured causing the oil that was being unloaded from the trucks into Tank 13 to leak out of the bottom. Shortly thereafter the leak was discovered.

9. The leak occurred during the unloading of the oil from the Superior-owned tanker trucks into Tank 13 at Superior's terminal in Ingleside. To state it more simply and directly, the Event and the resulting pollution related costs and expenses occurred and resulted during and as a result of the unloading of oil from the (insurance policy-scheduled) tanker trucks into Tank 13 which ruptured as a result of the additional weight of the oil being unloaded from the tanker trucks into Tank 13, exceeding the load bearing

6

capacity of the weakened tank floor.

Superior Crude also filed a second amended petition, alleging that the PLBC endorsement of the Truckers Coverage expanded pollution coverage to include the Event because it "occurred while the oil was still owned by Superior [C]rude, still in its possession, and prior to it being finally delivered to Superior[ Crude's] purchaser." But this time, in response to Zurich's insuring-agreement-coverage argument, Superior Crude also claimed that "the Event arose out of the 'use' of Superior [Crude's] scheduled trucks, tanker trucks, and trailers."

Zurich replied to Superior Crude's response to its summary judgment motion, arguing that the response was without merit because (1) "Superior [Crude's] interpretation of the Policy relies on language that is not in the Policy," and (2) "the Policy requires that a covered injury be caused by the ownership, maintenance or use of a covered auto, not just that it occur[ed] during the ownership, maintenance or use of a covered auto." Zurich again asserted that Superior Crude failed to meet its own summary judgment burden or to raise a genuine issue of material fact in response to Zurich's motion. Zurich attached to its e-filed motion the affidavit of Holly Trager, Zurich's custodian of records for this lawsuit. The affidavit proved up twenty-two pages of business records attached to her affidavit. The business records included a December 31, 2010 letter from Zurich to Superior Crude, which provided:

> Our coverage investigation, as it pertains to the Truckers Coverage Form, is complete. We have reviewed documentation from the EPA as to the cause of loss, and a crack in the tank floor is the sole reason listed. This loss does not arise out of the maintenance, use or ownership of the vehicles used to transport the crude oil. As such, this is not a claim that would be covered under the Truckers Coverage Form.

7

The EPA documentation referenced in this December correspondence and attached to Trager's affidavit was an October 18, 2010 letter from Superior Crude to the EPA identifying the cause of the spill as "[a] crack in the floor of Tank 13."[3]

After considering both motions for summary judgment and reviewing the pleadings and papers on file, the trial court granted Zurich's summary judgment motion and denied Superior Crude's motion. The trial court further declared that "the Zurich Policy at issue does not provide coverage for claims related to the crude oil release that occurred on or about February 9, 2010." Superior Crude appealed from the trial court's final judgment.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

We review the trial court's ruling on a motion for summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). In the case of a traditional summary judgment, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

On cross-motions for summary judgment, each party bears the burden of establishing it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000); *Shoberg v. Shoberg*, 830 S.W.2d 149, 151–52 (Tex. App.—Houston [14th Dist.] 1992, no writ) (op. on reh'g) (explaining that

---

[3] Superior Crude filed a motion to strike Zurich's reply on the basis that Zurich filed it untimely in violation of a Rule 11 agreement. Zurich responded to the motion to strike, and Superior Crude replied to that response. At the hearing on the parties' motions for summary judgment, the trial court carried Superior Crude's motion to strike with the case. The record contains no order granting or denying this motion. The trial court stated in its judgment that it considered both motions for summary judgment and reviewed the pleadings and papers on file. We will do likewise.

when both plaintiff and defendant move for summary judgment, each must carry its own burden to conclusively prove all elements of cause of action as matter of law); *see* TEX. R. CIV. P. 166a(c). We review the summary judgment evidence presented by both parties, determine all questions presented, and render the judgment that the trial court should have rendered or remand the cause if neither party has met its summary judgment burden. *City of Garland*, 22 S.W.3d at 356; *Al's Formal Wear of Houston, Inc. v. Sun*, 869 S.W.2d 442, 444 (Tex. App.–Houston [1st Dist.] 1993, writ denied) (op. on reh'g).

An insured seeking coverage has the initial burden of establishing coverage under the terms of the policy. *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010); *Ulico Cas. Co. V. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008). We need not consider a policy's exclusions and other provisions unless and until the insured shows its claim comes within the policy's insuring agreement. *See Gilbert Tex. Const.*, 327 S.W.3d at 124.

## III. DISCUSSION

### A. The Issue

Superior Crude presents the following issue for our review:

> In light of the fact that the Event arose out of or resulted from—and during— the *unloading* of oil from Superior's insured oil tanker trucks, did the trial court err in ruling that the Zurich Policy did not provide coverage for claims related to the Event; notwithstanding the existence of a 'Pollution Liability-Broadened Coverage for Covered Autos—Business Auto, Motor Carrier and Truckers Coverage' endorsement on the Policy?

(Emphasis in original.)

Although the Truckers Coverage includes a PLBC endorsement—and Superior Crude uses "notwithstanding" language in its articulation of the issue, suggesting reliance

9

on that provision—we conclude it is the Truckers Coverage insuring agreement that controls our determination of coverage. The insuring agreement provides that Zurich would pay "all sums an 'insured' legally must pay as a 'covered pollution cost or expense' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of covered 'autos.'" Specific to this provision Superior Crude sets out that "the question is simply whether or not the leak *arose out of* or *resulted from the unloading* of the oil into Tank 13."[4] (Emphasis in original.). This question addresses the "use" of covered tankers.

## B. The "Use" Language

The Texas Supreme Court has consistently held that the "use" language found in an insuring agreement requires a causal relation between the covered auto and the injury or damage. *See Lancer Ins. Co. v. Garcia Holiday Tours*, 345 S.W.3d 50, 56–58 (Tex. 2011); *Mid-Century Ins. Co. of Tex. v. Lindsey*, 997 S.W.2d 153, 156–64 (Tex. 1999); *State Farm Mut. Auto. Ins. Co. v. Whitehead*, 988 S.W.2d 744, 745 (Tex. 1999) (per

---

[4] Superior Crude also claims that the Policy covered the loading and unloading of oil because it did not specifically exclude those actions. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc.,* 811 S.W.2d 552, 555 (Tex. 1991) ("An intent to exclude coverage must be expressed in clear and unambiguous language."); *see also EMCASCO Ins. v. Am. Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 525 (5th Cir. 2006) ("Texas courts have read business auto policies to cover loading and unloading of the covered vehicle even if that is not specifically mentioned in the text of the policy."). Zurich responds that it is not arguing that the Policy excluded loading and unloading activities from coverage or that it based its denial of coverage on such an exclusion. *See Farmers Ins. Exch. v. Rodriguez*, 366 S.W.3d 216, 226 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ("[A]utomobile liability policies *may* cover loading and unloading of a vehicle even when those terms are not specifically included in the policy.") (emphasis added). Instead, Zurich claims that it denied Superior Crude's claim because *the oil release* "[*did*] *not arise out of the maintenance, use, or ownership of the vehicles used to transport the crude oil*." (Emphasis added.) Because we conclude herein that the insuring agreement did not cover the Event at issue, we need not discuss the issue of whether coverage for loading and unloading of oil was specifically excluded under the policy. *See* TEX. R. APP. P. 47.1.

curiam); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines*, 939 S.W.2d 139, 142 (Tex. 1997) (per curiam). "To be a producing cause of harm, the use must have been a substantial factor in bring[ing] about the injury, which would not otherwise have occurred." *Lancer*, 345 S.W.3d at 57 (citing *W. Invs., Inc. v. Ureno*, 162 S.W.3d 547, 551 (Tex. 2005)). Whether this causal relationship exists between the tanker trucks and the oil spill is the dispositive issue before this Court. "[W]hen the injury complained of is purely incidental to the use of a vehicle, this nexus is not shown and the policy does not provide coverage." *Whitehead*, 988 S.W.2d at 745.

## C. The *Lindsey* Causal-Relationship Test

A determination of whether there is a causal relation between injury and auto is fact-specific. *Lindsey*, 997 S.W.2d at 157. And although not an absolute test, the Texas Supreme Court recommended the following factors that it considered "helpful in focusing the analysis" of the coverage question:

(1)　the accident must have arisen out of the inherent nature of the automobile, as such,

(2)　the accident must have arisen within the natural territorial limits of an automobile, and the actual use must not have terminated,

(3)　the automobile must not merely contribute to cause the condition which produces the injury, but must itself produce the injury.

*Lancer*, 345 S.W.3d 55–56 (quoting *Lindsey*, 997 S.W.2d at 157).

### 1. *Lindsey*'s First Factor

We need not address the first factor set out in *Lindsey*—the inherent-nature-of-the-automobile factor—because even assuming that unloading oil is within the inherent nature of the tanker trucks, we still conclude, as discussed below, that the second and

11

third factors could not be satisfied.   So we begin our review with the second factor.   *See* TEX. R. APP. P. 47.1.

### 2.   *Lindsey*'s Second Factor

*Lindsey's* second factor provides, in relevant part, that "the accident must have arisen within the natural territorial limits of an automobile . . . ."   *Lindsey*, 997 S.W.2d at 157; *see Brown v. Houston Indep. Sch. Dist.*, 123 S.W.3d 618, 622 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (applying the *Lindsey* test and concluding that the patrol car was not being "used" when the injuries from the assault "did not occur within the territorial limits of the patrol car; instead, they occurred in appellant's truck and in the parking lot").   Courts have determined that "natural territorial limits" are not limited to the interior of a vehicle.   *See Mid-Continent Cas. Co. v. Global Enercom Mng't, Inc.*, 323 S.W.3d 151, 156 (Tex. 2010) (per curiam) (concluding that the loss occurred "within the natural territorial limits" of an F-250 pickup when the workers fell from a "headache ball" that was attached to a rope, attached to a pulley, and anchored to the front bumper of the truck); *Farmers Ins. Exch. v. Rodriguez*, 366 S.W.3d 216, 220, 227 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (holding that Rodriguez's injuries occurred "within the natural territorial limits of the trailer, even though Woodling and Rodriguez had taken a few steps out of the trailer" and the deer stand no longer touched the trailer as they were unloading it); *see Salcedo v. Evanston Ins. Co.*, 462 Fed. App'x 487, 491 (5th Cir. 2012) (per curiam) (instructing that the accident occurred within the truck's natural territorial limits when a hose from a plant's asphalt reservoir to an oil truck ruptured as hot oil was moving through it and injured a worker before the actual use—the uploading of oil—

12

terminated).[5]  In this case, however, the accident—the oil release—did not arise within the natural territorial limits—the interior or exterior of any tanker truck or even, by extension, an area outside the tanker trucks.  Instead, the accident arose within the natural territorial limits of the aboveground oil storage tank.

The summary judgment evidence establishes that the accident—the oil release or spill—occurred from within an aboveground oil storage tank.  The oil escaped through a crack in the floor of Tank 13.  It did not escape or spill from the tanker trucks.  No oil escaped from a rupture of any tanker truck hose; no oil escaped from a failure of any other tanker truck part.  In his affidavit, Kirby described the failure of the weakened bottom of Tank 13.  As Superior Crude asserts and Kirby sets out in his affidavit, the additional weight of the oil being unloaded "exceeded the weight[-]bearing capacity of the [weakened] tank floor," and the weakened tank floor "suddenly and catastrophically ruptured."  The fact that oil flowed from the tanker trucks into Tank 13, without more, is not enough to support a determination that the accident in this case arose within the natural territorial limits of the tanker trucks.  *See Lindsey*, 997 S.W.2d at 157.  The summary judgment evidence shows that it was the natural territorial limits of the tank, not the tanker trucks, from which the Event arose.

### 3.  *Lindsey*'s Third Factor

Finally, focusing on *Lindsey*'s third component, the "auto" must not merely contribute to cause the condition that produces the injury; it must produce the injury.  *See*

---

[5] The Fifth Circuit determined that *Salcedo v. Evanston Insurance Co.* is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4, which it concluded did not apply in *Salcedo.*  462 Fed. App'x 487, 488 (5th Cir. 2012) (per curiam); *see* 5TH CIR. R. 47.5.

*id.* This "factor is especially troublesome because of the difficulty in many circumstances of deciding what role a vehicle, as opposed to other things, played in producing a particular injury . . . . The degree of the vehicle's involvement in the production of the injury is a difficult factor to judge . . . ." *Id.* at 157–58. And as the Texas Supreme Court has noted, "not every injury capable of connection to the use of an auto is a covered use." *Lancer*, 345 S.W.3d at 56 (comparing cases where the courts determined that the vehicle was not a producing cause of the injury, which occurred in or near the vehicle with cases where the courts concluded that the vehicle caused the injury).

The summary judgment evidence in this case established that the cause of the oil release was subsidence in the soil below Tank 13 that led to a crack in the tank floor. On October 18, 2010, Kirby reported to the EPA that the cause of the oil release was "[a] crack in the floor of Tank 13." On November 3, 2010, Gamble signed an affidavit on behalf of Superior Crude stating that the cause of the release was sand erosion that caused the tank floor "to crack and give way." On November 3, 2011, responding to Zurich's requests for admission, Superior Crude admitted that "[t]he cause of the Oil Release was the result of a subsidence and/or collapse of the Tank 13 floor bottom of the tank . . . ." And in Kirby's second affidavit, he explained that: (1) because salt water naturally occurs in oil, it will sink to the bottom of the tank when oil is unloaded into it; (2) there was naturally-occurring corrosion to the bottom of the plates in the tank because of the corrosive nature of salt water; and (3) this corrosion caused tiny pin holes to develop on the plates comprising the floor of Tank 13 and allowed salt water to escape undetected out the bottom. Kirby also set out that the salt water then created pockets or voids in the

14

sand that had supported the tank bottom.   Kirby continued,

> As a result of these voids underneath the tank bottom/floor, as the tank was filled with oil during the unloading process from the trucks, the weight of the additional oil on the now "unsupported" tank bottom caused the tank bottom to subside and "sink" in the voids that had been created.   This resulted in stress on the lap weld seams of the plates comprising the tank bottom.   As a result of the oil being unloaded into Tank 13 on February 9, 2010, the additional weight of the oil being unloaded from the trucks into Tank 13 placed stress on the weakened tank floor bottom to the point that the weight exceeded the weight-bearing capacity of the tank floor.   The tank floor then suddenly and catastrophically ruptured causing the oil that was being unloaded from the trucks into Tank 13 to leak out of the bottom.

Based on our review of the summary judgment evidence presented by both parties, we cannot conclude that Superior Crude met its burden, as the insured, of establishing coverage under the terms of the policy.   *See Gilbert Tex. Const.,* 327 S.W.3d at 124; *Ulico Cas. Co.*, 262 S.W.3d at 782.   It has not shown that use of a covered auto—the tanker trucks in this case—caused the oil release.

> Superior Crude nonetheless argues
>
> that the *unloading* process from the insured trucks of 520 tons of oil into Tank 13 exceeded the load bearing capacity of the tank floor causing it to break and the oil to flow out as the oil <u>continued</u> to be *unloaded* from the insured trucks.   In other words, the floor of Tank 13 failed—and the Event occurred—as a *result of*—and during—the *unloading* of the oil from the insured trucks into the Tank.

(Emphasis in original.)   We are not persuaded by this argument.   The summary judgment evidence does not establish that the oil unloaded from the tanker trucks exceeded the load bearing capacity of the tank floor and caused it to break.   What the summary judgment evidence shows is that the weight of oil unloaded from the tanker trucks exceeded the load bearing capacity of the *already weakened* tank floor.

Superior Crude also asserts that it is even more apparent that it satisfied *Lindsey's*

15

third factor "when the causal relationship involved here is compared to the attenuated relationship between the *Lindsey* truck and the injury in that case. If 'use' of a pickup can cause personal injuries from a shotgun blast, 'use' of an oil tanker unloading oil can certainly cause an oil spill." *See Lindsey*, 997 S.W.2d 153, 156–64. Again, we are not persuaded by Superior Crude's argument.

In *Lindsey*, a nine-year-old boy, Richard Metzer, was attempting an unorthodox entry into a parked, locked pickup truck through its sliding rear window when "he accidentally touched a loaded shotgun resting in a gun rack mounted over the rear window, causing the gun to discharge. The buckshot struck Richard Lindsey, who was seated in his mother's car parked next to the pickup." *Id.* at 154. The *Lindsey* Court concluded the following:

> Lindsey's injury arose out of the use of the Metzer truck as a matter of law. Metzer's son's sole purpose was to gain entry into the truck to retrieve his clothing. His conduct did not stray from that purpose. He did not play with the gun, or try to shoot it, or load or unload it, or purposefully handle it in any way. His contact with the gun was entirely inadvert. Although the boy was attempting an unorthodox method of entry, it was not an unexpected or unnatural use of the vehicle, given his size, the fact that the vehicle was locked, and the nature of boys. It was the boy's efforts to enter the vehicle that directly caused the gun to discharge and Lindsey to be injured. . . . Application of the third . . . factor makes this a close case, but we think on balance the Metzer truck "produced" . . . the injury. Certainly, the truck was not merely the situs of activity, unrelated to any use of the truck that resulted in the accident.

*Id.* at 158–59.

Although suggesting that the causal connection in this case is less attenuated than the *Lindsey* connection, Superior Crude makes no claim that some part of the truck malfunctioned or was inadvertently misused during the loading process, such that the tanker truck directly caused the oil spill. *Cf. id.* (explaining that "[i]t was the boy's efforts

16

to enter the vehicle that directly caused the gun to discharge and Lindsey to be injured"). Superior Crude makes no allegations that the drivers of the tanker trucks or anyone else took affirmative actions while unloading the oil that may have contributed to the accident, and no evidence supports such a conclusion. *Cf. id.; Austin Indep. Sch. Dist. v. Gutierrez*, 54 S.W.3d 860, 866 (Tex. App.—Austin 2001, pet. denied) (concluding that a girl's injuries, which occurred when she was hit by a car and killed, arose out of the use of the school bus when the bus driver took "the affirmative action of honking the horn" signaling the girl she could cross the street). In short, the facts in *Lindsey* are distinguishable from the facts in this case.

Like *Lindsey*, this is a close case, *see Lindsey*, 997 S.W.2d at 159, but unlike *Lindsey*, we cannot conclude that there was a causal relation between the tanker trucks and the oil spill. Focusing on the facts that show the origin of the damages, *see id.* at 164 (citing *Nat'l Union Fire Ins.*, 939 S.W.2d at 141), the tanker trucks merely contributed to the condition that produced the oil release; they did not cause the oil release. *See id.* at 157. In other words, the tanker trucks were not "substantial factor[s] in bring[ing] about the injury, which would not otherwise have occurred." *See Mid-Continent Cas. Co.*, 323 S.W.3d at 156 (citing *Ureno*, 162 S.W.3d at 551); *Lancer*, 345 S.W.3d at 57. At best, the loading of oil into the tank was only an incidental connection between the oil release and a covered "auto." *See Whitehead*, 988 S.W.2d at 745.

**E. Summary**

Having reviewed the summary judgment evidence presented by both parties, *see City of Garland*, 22 S.W.3d at 356, we agree with the trial court that, as a matter of law,

17

Superior Crude's claimed injury was not covered by the Policy provided by Zurich; under *Lindsey* specifically, the injury was not covered under the Policy's Truckers Coverage insuring agreement. And because Superior Crude, the insured, has not shown that its claim comes within the Truckers Coverage insuring agreement, we need not consider whether the PLBC endorsement provides coverage. *See Gilbert Tex. Const.*, 327 S.W.3d at 124. The trial court properly granted Zurich's motion for summary judgment and denied Superior Crude's motion. We overrule Superior Crude's sole issue on appeal.

## IV. CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
31st day of July, 2014.