MID–CONTINENT CASUALTY
COMPANY, Petitioner,

v.

GLOBAL ENERCOM MANAGEMENT,
INC., Respondent.

No. 09–0744.

Supreme Court of Texas.

Oct. 1, 2010.

Timothy Poteet, Chamberlain & McHaney, Austin, TX, Matthew E. Coveler, Jennifer Bruch Hogan, Hogan & Hogan, L.L.P., Houston, TX, J. Mike Johanson, Kelley Jewell Friedman, Johanson & Fairless, L.L.P., Sugar Land, TX, for Petitioner.

John Kenneth Woodard, Bush & Ramirez LLC, Houston, TX, for Respondent.

PER CURIAM.

In this case, we must determine whether two exclusions in insurance policies—"auto use" and "subsequent-to-execution"—preclude coverage for a subcontractor's workers who fell and died after being hoisted up on a rope through a pulley system by a pickup truck. The subcontracts for which the insurance policies allegedly provided coverage were signed after the work had begun. The trial court and court of appeals held that neither exclusion applied and granted summary judgment to the policyholder, declaring coverage under both policies. 293 S.W.3d 322, 325, 328 (Tex.App.-Houston [14th Dist.] 2009, pet. granted). We affirm in part, reverse in part, and render judgment.

The relevant facts are not in dispute. Global Enercom Management, Inc. is a Delaware corporation with its principal place of business in Houston. It constructs and maintains cellular phone towers. Global subcontracted with All States Construction Company to perform repair work on a cell tower located in Arkansas. A provision of Global's subcontract with All States required All States to indemnify Global for "all acts and omissions of its employees, on the site where the Work is being performed and for all acts and omissions of its subcontractors, agents and vendors...." All States signed and delivered the subcontractor agreement to Global and began work on the project, but Global did not immediately sign the contract.

Mid–Continent Casualty Company is All States's insurer, and it issued both a commercial general liability policy (CGL) and a commercial auto policy (CAP) to All States. The CGL policy has a limit of $1,000,000 per occurrence, and the CAP has a limit of $100,000 per occurrence. Each policy also provides coverage extending to additional "insured contracts" when All States enters into contracts "pertaining to [its] business" in which All States "assume[s] the tort liability of another to pay for 'bodily injury' or 'property damage' to a third party or organization," so long as the liability occurred "subsequent to the execution of the contract or agreement."

All States employees began repairing the cell tower in December 2001, continuing into January 2002. As part of the repairs, the employees set up a rope-and-pulley system on the tower. One end of the rope was anchored on a spool and was run through a pulley attached to the "towing point," or eye hooks, on the front bumper of a 2000 Ford F–250 Super Duty truck. The truck was parked some distance away from the tower on the opposite side of an outbuilding. The rope also ran through pulleys installed on the top and bottom of the 280–foot cell tower and was finally anchored to a headache ball on the other end of the rope. Three workers were instructed by the foreman to climb the tower to take measurements. They tried to reach the top of the tower by attaching themselves to the headache ball at the end of the rope and signaling the foreman to back the truck away from the tower to pull the rope through the pulleys and raise the headache ball. The foreman

driving the truck did not see the workers until they had been raised approximately fifteen to twenty feet in the air, over the building obstructing his view. The foreman gave a hand signal, communicating "What's going on?" The workers, attached to the headache ball, gave another "up" signal, indicating to the foreman to continue driving the truck. Although the foreman knew this was not common practice and potentially unsafe, he nevertheless continued to drive the truck in reverse, away from the tower, lifting the three workers to a height of eighty feet. The rope broke, and the workers fell to their deaths. The day after the incident, Global signed the subcontract.

The heirs of the deceased workers brought suit against Global in federal court in Mississippi. Global sought indemnification from Mid–Continent as an additional insured under All States's CGL and CAP policies. Mid–Continent defended but ultimately refused to indemnify Global, and Global then filed this case in Texas, seeking, among other things,[1] a declaration of a right to defense and indemnification from Mid–Continent. Mid–Continent filed a counterclaim seeking declarations that it owed no duty to indemnify or defend Global, that Global was not an additional insured under any policies issued by Mid–Continent to All States, and that it did not commit any statutory violations.

The parties each filed motions for summary judgment. Mid–Continent argued two separate bases for denial of coverage. First, Mid–Continent claims that the "auto-use" exclusion in the CGL policy precludes coverage. The exclusion states that the policy does not apply to:

> "[b]odily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.

The policy defines the term "auto" as "a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment."

Second, Mid–Continent denied coverage under the CGL and CAP policies pursuant to the "subsequent-to-execution" clauses in each. Those clauses provide that a claim under an "insured contract" is only covered under the policies if "the 'bodily injury' or 'property damage' occurs subsequent to the execution of the [insured] contract or agreement."

The trial court granted Global's motion for summary judgment and denied Mid–Continent's. Mid–Continent appealed.[2] The court of appeals affirmed, holding that neither exclusion applied. 293 S.W.3d at 328. One justice dissented in part, arguing that the "auto-use" exclusion should bar coverage under the CGL policy, but he agreed with the majority that the "subsequent-to-execution" exceptions did not bar recovery under the policies. *Id.* at 329–32 (Seymore, J., dissenting in part and concurring in part). Mid–Continent petitioned this Court for review.

When both parties move for summary judgment and the trial court grants one motion and denies the other, the re-

---

1. Global eventually dismissed all claims against Mid–Continent other than its declaratory judgment claims.

2. Prior to the trial court's decision, Global non-suited its direct claims against All States and its owner, Irving Barnes. After the trial court granted Global's summary judgment motion, Global dismissed its claim for attorneys' fees against Mid–Continent under the Texas Civil Practice and Remedies Code. Thus, the summary judgment entered in Global's favor was final and appealable.

viewing court should review the summary judgment evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex.2004) (citation omitted). We analyze disputes over the interpretation of insurance contracts under the well-established principles of contract construction, attempting to determine the parties' intent through the written language of the policy. *E.g., State Farm Lloyds v. Page*, 315 S.W.3d 525 (Tex.2010) (citing *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995)). If a contract for insurance has a clear and definite meaning, then it is not ambiguous as a matter of law, even if the parties interpret a policy differently. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*(Tex.2010) (citations omitted).

We first address whether the "auto-use" exclusion bars coverage for the injury under the CGL policy. In the case before us, Mid–Continent alleges that using the truck with an attached pulley to lift the workers "arises out of" the use of an "auto" and excludes coverage. The parties do not dispute that the truck was hoisting the headache ball with the workers attached when the rope broke. But the parties dispute what caused the rope to break, and, more relevant here, whether the "use" of the truck was sufficient to trigger the "auto-use" exclusion and preclude coverage under the CGL policy.

The leading case from this Court regarding "auto-use" exceptions or inclusions to coverage is *Mid–Century Insurance Co. of Texas v. Lindsey*, 997 S.W.2d 153 (Tex. 1999). In *Lindsey*, a boy attempted to access a locked pickup truck through its back window, but in the process accidentally touched a shotgun mounted over the window, causing it to discharge and injure a person sitting in an adjacent vehicle. *Id.* at 154. The injured party settled with the owners of the first vehicle for an amount less than his total injuries and then sought underinsured motorist coverage from the insurer of the vehicle in which he was sitting. *Id.* That insurance company denied coverage, arguing, among other things, that the vehicle owner's policy did not provide coverage because the accident did not "arise out of" the "use" of a motor vehicle. *Id.* at 155.

The Court used the factors announced in two insurance treatises[3] to focus the analysis in determining whether an automobile's "use" clause applied to a particular claim.

> For an injury to fall within the "use" coverage of an automobile policy (1) the accident must have arisen out of the inherent nature of the automobile, as such, (2) the accident must have arisen within the natural territorial limits of an automobile, and the actual use must not have terminated, (3) the automobile must not merely contribute to cause the condition which produces the injury, but must itself produce the injury.

*Lindsey*, 997 S.W.2d at 157.[4] The Court held that the factors were satisfied be-

3. *See* 6B JOHN A. APPLEMAN, INSURANCE LAW AND PRACTICE § 4317, at 367–69 (Buckley ed.1979); 8A COUCH ON INSURANCE 3d § 119:37, at 119–56 (2005).

4. The *Lindsey* Court noted that the Appleman/Couch test was not an "absolute test," and that the factors were not necessarily de-

terminative in analyzing whether a motor vehicle was "used" for insurance coverage purposes. *Lindsey*, 997 S.W.2d at 157–58. In this case, we likewise do not adopt the Appleman/Couch test as an absolute test, but rather continue to use it as a conceptual framework to analyze the exclusion at issue.

cause the child was attempting to gain entry into the truck through the back window and the child did not stray from that purpose by playing with the gun or trying to shoot it. *Id.* at 158. The "injury producing act and its purposes are an integral part of the use of the vehicle as such," and therefore the injury caused by the discharging gun arose out of the use of the vehicle. *Id.* at 161.

The court of appeals in this case held that *Lindsey* was limited to insurance coverage claims involving the discharge of firearms or was at least distinguishable on its facts. 293 S.W.3d at 327. It instead held that the present case was controlled by *Brown v. Houston Independent School District*, 123 S.W.3d 618 (Tex.App.-Houston [14th Dist.] 2003, pet. denied), and *National Union Fire Insurance Company of Pittsburgh, PA v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139 (Tex.1997).

The court of appeals erred in disregarding *Lindsey*. Although the Court in *Lindsey* discussed the nuances of different claims involving the discharge of firearms in or near motor vehicles, nothing in the language of the opinion, or its subsequent application by this Court, suggests that *Lindsey*'s holding or reasoning is limited to gun rack or firearms cases. Additionally, *Lindsey* has been compared to or relied on by this Court in other types of auto-coverage cases that do not involve firearms. *E.g., U.S. Fid. & Guar. Co. v. Goudeau*, 272 S.W.3d 603, 606 (Tex.2008) (concerning a "Good Samaritan" who was hit by a passing car and sustained injuries after he exited his employer's insured vehicle to assist a stranded motorist); *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex.2004) (concerning an insurer's duty to defend where an insured doctors' employee allegedly administered contaminated anesthetics); *see also Lincoln Gen. Ins. Co. v. Aisha's Learning*

*Ctr.*, 468 F.3d 857, 859–60 (5th Cir.2006) (declaring that *Lindsey*'s test for "use" is to be interpreted broadly and holding that an auto exclusion provision in a CGL policy applied when a child was left in a daycare van during extreme heat).

■ Using the Appleman/Couch factors elucidated in *Lindsey* as a framework, we conclude that the exclusion applies to this case as a matter of law. First, it is in the inherent nature of a 2000 Ford F–250 Super Duty pickup truck on a cell tower job site that it will be used to haul and tow materials. The truck was leased for the specific purpose of completing work under the insured contract, and it was equipped with eye hooks on the front bumper, to which the pulley was attached for that type of use. Using an F–250 truck in this way "was not an unexpected or unnatural use of the vehicle," given the vehicle's location on the job site and its specifications for this type of work. *Lindsey*, 997 S.W.2d at 158. Second, the accident was within the "natural territorial limits" of the truck. In *Lindsey*, this factor was met even though the injury occurred in an adjacent vehicle. Significantly in this case, the CGL policy defines "auto" to include "attached machinery and equipment." Even though the workers were on the other side of a building and not inside the vehicle, the workers were still attached to the pulley system, which was part of the vehicle, which was in use at the time of the accident.

■ The third factor is a causation analysis. The parties recognize that some formulation of "but-for" or "producing cause" causation applies, but Global argues that the truck was not a "substantial factor" causing the injury. *See, e.g., Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 122 (Tex.2009) (defining the elements of cause-in-fact as proof that "(1) the negli-

gent act or omission was a substantial factor in bringing about the harm at issue, and (2) absent the negligent act or omission ("but for" the act or omission), the harm would not have occurred" (citation omitted)). In defining "use of an auto" in insurance policies, "Texas courts define 'use' broadly." *Lincoln Gen. Ins. Co.,* 468 F.3d at 859 (quoting, among other cases, *Lindsey,* 997 S.W.2d at 156; *State Farm Mut. Auto. Ins. Co. v. Pan Am. Ins. Co.,* 437 S.W.2d 542, 545 (Tex.1969); *Utica Nat'l Ins. Co.,* 141 S.W.3d at 203; *Le-Leaux v. Hamshire–Fannett Ind. Sch. Dist.,* 835 S.W.2d 49, 51 (Tex.1992)). In *Lindsey,* the Court acknowledged that the third factor may be difficult to define because it is not always clear how the vehicle contributed to an accident. *Id.* at 157. This Court later clarified that " 'arise out of' means that there is simply a 'causal connection or relation,' which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation." *Utica Nat'l Ins. Co.,* 141 S.W.3d at 203 (citing *Lindsey,* 997 S.W.2d at 156). "Arise out of" may indicate more direct causation if the insurance policy dictates, but no such differentiating language exists in this policy. *Cf. id.* (holding that "arise out of" required more direct causation because the insurance policy at issue differentiated between accidents that "arise out of" one cause and accidents that are "due to" another cause).

There is a greater causal relationship in this case than existed in *Lindsey.* Global asserts that it was the defective rope, not the truck, that caused the injuries, but the rope would not have broken if the truck was not used to hoist the headache ball. The court of appeals held that the pickup truck simply "provided the power for the pulley system," but here, the workers could not have been raised on the rope through the pulley system without the use of mechanical assistance. 293 S.W.3d at

327. This is not the case where "the [negligent actor] could be standing still and accomplish the same result." *Lindsey,* 997 S.W.2d at 158. The accident did not merely happen because the rope broke; the accident did not merely happen in or near the truck; the workers could not have accomplished the same result without the truck; and one of the expected purposes of this particular truck was to perform towing and lifting activities. The "auto-use" exclusion in All States's CGL policy precludes coverage for the accident under that policy, and the trial court and court of appeals erred in holding otherwise.

Furthermore, this case is not controlled by *Brown* and *National Union. Brown* involved an officer who pulled over a woman in his patrol car and sexually assaulted the woman in her own vehicle. 123 S.W.3d at 619. The only relevance of the vehicle was that it was the location of the sexual assault. This act of violence did not arise out of the inherent nature of an automobile, nor did it produce the injury. In *National Union,* the only facts in the pleadings were that the driver of a vehicle "negligently discharged a firearm and caused a bullet to strike" a passenger in a vehicle traveling nearby. 939 S.W.2d at 141. There were no allegations of a causal connection whatsoever between the automobile and the shooting. *Id.* at 142. The truck was merely the situs of the alleged negligence, and the mere fact that the allegedly negligent party was driving was insufficient to qualify as an "accident resulting from the ... use of a covered auto." *Id.*

The second exclusion Mid–Continent cites to deny coverage to Global is the "subsequent-to-execution" exclusion found in both the CGL and CAP policies. These clauses prohibit coverage for a claim under an "insured contract" if the incident "occurs subsequent to the execution of the

[insured] contract or agreement." "Execution" is not defined either in the insurance policies or in the subcontract. Mid–Continent agrees that the subcontract between All States and Global would be an "insured contract" if it were "executed" prior to the incident and concedes that the contract signed by All States and remitted back to Global is probably valid and enforceable. Yet Mid–Continent claims that the contract did not meet the definition of "insured contract" as defined by the policies because Global did not sign the subcontract with All States prior to the accident.

Mid–Continent alleges that result is dictated if the Court gives the term "execute" its "ordinary and accepted meaning." But the word "execute" has several definitions and is not constrained by Mid–Continent's argument that "to execute" may only mean "to sign." Black's Law Dictionary defines "execute" as "[t]o perform or complete (a contract or duty) ... [t]o change (as a legal interest) from one form to another ... [or] [t]o make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form...." BLACK'S LAW DICTIONARY (8th ed.2004). Further, Texas law recognizes that a contract need not be signed to be "executed" unless the parties explicitly require signatures as a condition of mutual assent.

> If a written draft of an agreement is prepared, submitted to both parties, and each of them expresses his *unconditional* assent thereto, there is a written contract.... [I]f there is a writing, there need be no signatures unless the parties have made them necessary at the time they express their assent and as a condition modifying that assent.... An unsigned agreement all the terms of which are embodied in a writing, *unconditionally* assented to by both parties, is a written contract....

*Simmons & Simmons Constr. Co., Inc. v. Rea,* 155 Tex. 353, 286 S.W.2d 415, 418 (1956) (quoting 1 CORBIN ON CONTRACTS §§ 31–32); *see also Travelers Ins. Co. v. Chicago Bridge & Iron Co.,* 442 S.W.2d 888, 895 (Tex.Civ.App.-Houston [1st Dist.] 1969, writ ref'd n.r.e) ("The term 'execute' means 'to finish' or 'make complete.' The execution of a contract includes the performance of all acts necessary to render it complete as an instrument."); *cf. Scaife v. Associated Air Ctr., Inc.,* 100 F.3d 406, 410–11 (5th Cir.1996) (applying Texas law and holding no contract was formed when the contract was never delivered, neither party signed the agreement, and the contractor never began work pursuant to the contract).

Global offered the contract to All States, and All States accepted not only by signing and faxing the agreement back to Global, but also by beginning performance on the contract work. *United Concrete Pipe Corp. v. Spin–Line Co.,* 430 S.W.2d 360, 364 (Tex.1968) ("[P]erformance of that act which the offeree was requested to promise to perform may constitute a valid acceptance."). Further, there was mutual assent to All States's work by Global. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 850 (Tex. 2009) (noting that mutual assent can be inferred from the circumstances). All States and Global agree that the insured contract was effective, and the companies were operating under that agreement when the accident occurred. In fact, a representative of Global was at the job site while All States's employees installed the pulley system.

■ Although not signed by Global until after the accident, the subcontract with All States was nonetheless "executed" before the accident. There is no language in the policies requiring both parties to sign the insured contract, and there was no evi-

dence raising a fact issue of the parties' intent to require that all parties to the subcontract sign it as a condition precedent to the subcontract's validity. The evidence shows just the opposite. Therefore, the "subsequent-to-execution" exclusions in both CGL and CAP policies do not bar coverage, and that portion of the court of appeals' opinion is affirmed.

We hold that the court of appeals correctly determined that the insured contract was executed, and that the "subsequent-to-execution" exclusions in the CAP and CGL policies were not triggered as a matter of law. We therefore affirm the judgment of the court of appeals and the trial court's grant of summary judgment to Global on this issue. However, the court of appeals erred in holding that the "auto-use" exclusion in All States's CGL policy did not apply. Accordingly, we reverse the judgment of the court of appeals and render partial summary judgment in favor of Mid–Continent on this issue. Without hearing oral argument, we affirm in part and reverse in part the judgment of the court of appeals and render partial summary judgment in favor of Mid–Continent, and partial summary judgment in favor of Global. See TEX.R.APP. P. 59.1.