

# IN THE
# TENTH COURT OF APPEALS

### No. 10-17-00408-CV

**GERRY L. SAUM, INDIVIDUALLY AND AS**
**INDEPENDENT EXECUTRIX OF THE ESTATE**
**OF SUSAN M. WOOD, DECEASED,**

                                             **Appellant**

 **v.**

**CITY OF COLLEGE STATION, TEXAS,**

                                             **Appellee**

---

**From the 361st District Court**
**Brazos County, Texas**
**Trial Court No. 17-002742-CV-361**

---

## MEMORANDUM OPINION

---

In three issues with numerous sub-parts, Appellant Gerry L. Saum, Individually and as Independent Executrix of the Estate of Susan M. Wood, Deceased ("Saum"), appeals the trial court's order temporarily enjoining her from conveying the property at issue in this case during the pendency of the suit. We affirm.

*Background*

The underlying facts are not disputed. Appellee City of College Station, Texas (the "City") approached Saum and offered to purchase two tracts of land she owned. After a lengthy negotiation, Saum agreed to sell the land to the City. The City sent Saum a detailed, but unsigned, real estate contract that Saum signed and returned on August 19, 2017. An assistant city manager signed the contract on August 31, 2017. The City Attorney signed the contract on September 1, 2017. The City Council met and approved the contract on September 11, 2017. No one from the City physically notified Saum of the City Council's vote. The City Manager signed the contract on September 12, 2017. On September 13, 2017, Saum sent a letter to the City revoking her acceptance of the contract as she had received a more favorable offer from another party. The Mayor signed the contract on September 14, 2017, which was acknowledged by the City Secretary.

Three weeks after Saum attempted to revoke the contract, the City informed Saum that she was in breach of the contract and threatened to sue her or to condemn her property under eminent domain. The City then filed this suit and obtained a temporary injunction preventing Saum from disposing of the property until the lawsuit had been resolved. The trial court made the following findings:

a) The City of College Station, Plaintiff (the "City") has established a probable right to relief in the form of an order requiring specific performance because:

    i. a valid and enforceable contract was formed on September 11, 2017, when the College Station City Council approved a real

estate contract between the City, the buyer, and Defendant, Gerry Saum, in her individual capacity and in her capacity as the independent executor of the Estate of Susan M. Wood, Deceased, ("Saum"), the seller, for the purchase and sale of the two tracts of property identified in that contract and below;

ii.    Saum's attempt to revoke an offer to sell or repudiate the contract on September 13, 2017, two days after the City Council approved the contract, was ineffective; and

iii.   The City has no adequate remedy at law for damages because the two tracts are unique and because the contract explicitly provides that specific performance is the City's sole remedy.

b)    if Saum is not enjoined from selling the subject tracts pending a trial on the merits of this case, it is likely that she will accept a firm cash offer and sell the tracts to a third party or entity.

c)    if Saum sells the subject tracts to a third party and not the City under the binding contract, the City will suffer irreparable harm because the subject matter of this lawsuit will be moot, the subject tracts are unique, and the City will be unable to acquire similar property to be used as a park for a similar price.

*Issues*

As noted, Saum raises three issues:

1.    Did the parties require signatures as a condition of mutual assent?

2.    Was the partially executed contract binding on the seller even without delivery?

3.    Was the seller's revocation effective?

As part of her first issue, Saum argues that the contract explicitly required signatures as a condition of mutual assent, that the parties' negotiations confirm that

signatures were required, and that the statute of frauds supports her argument. In her second issue, Saum asserts that the City did not attempt to execute the contract until after Saum revoked because the Mayor did not sign the contract until September 14, the handwritten date of purported execution on September 11 has no significance, and the City Manager's signature on September 12, did not make the contract binding. Finally, in her third issue, Saum argues that the contract was not valid because it was never delivered to her.

### *Standard of Review*

We review a temporary injunction for an abuse of discretion. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). A trial court abuses its discretion when it acts unreasonably or in an arbitrary manner, without reference to any guiding rules or principles. *Id.* at 211. We will not disturb the trial court's decision to grant injunctive relief absent a clear abuse of discretion. *Reagan Nat'l Advert. v. Vanderhoof Family Tr.*, 82 S.W.3d 366, 370 (Tex. App.—Austin 2002, no pet.). Our scope of review is limited to the validity of the order granting or denying injunctive relief, without reviewing or deciding the underlying merits. *Henry v. Cox*, 520 S.W.3d 28, 33-34 (Tex. 2017). "No abuse of discretion exists if some evidence reasonably supports the court's ruling." *Id.* at 34.

When reviewing the order, we view the evidence in the light most favorable to the order, indulging every reasonable inference in its favor, and "determine whether the

order was so arbitrary that it exceeds the bounds of reasonable discretion." *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 857 (Tex. App.—Fort Worth 2003, no pet.).

The applicant for a temporary injunction must establish: "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru*, 84 S.W.3d at 204. The applicant is not required to prove that it will prevail at a final trial. *Cheniere Energy, Inc. v. Parallax Enter's, LLC*, 585 S.W.3d 70, 76 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd) (on *en banc* reconsideration). An applicant's probable right of recovery is shown by alleging a cause of action and by presenting evidence tending to sustain it, meaning that the evidence must be sufficient "to raise a bona fide issue as to the applicant's right to ultimate relief." *Regal Entm't Group v. iPic-Gold Class Entm't, LLC*, 507 S.W.3d 337, 345 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (quoting *Intercontinental Terminals v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston [1st Dist.] 2011, no pet.)).

Saum does not argue that the City did not show a probable, imminent and irreparable injury or that the City did not state a cause of action for breach of contract. Saum's issues relate to whether the trial court abused its discretion in determining that the City established a probable right to relief.

### Discussion

A. General Contract Principles. Generally, a valid contract requires: "(1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds,

(4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Levetz v. Sutton*, 404 S.W.3d 798, 803 (Tex. App.—Dallas 2013, pet. denied); *see also Choctaw Properties, L.L.C. v. Aledo I.S.D.*, 127 S.W.3d 235, 245 (Tex. App.—Waco 2003, no pet.). One party may withdraw from a proposed contract up until the time the other party accepts. *See Morgan v. Bronze Queen Mgmt. Co., LLC*, 474 S.W.3d 701, 706 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Bowles v. Fickas*, 140 Tex. 312, 314, 167 S.W.2d 741, 743 (Tex. [Comm'n Op.] 1943).

The primary concern of the court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *See Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019).

> [A] contract's plain language controls, not what one side or the other alleges they intended to say but did not. We therefore look to objective manifestations of intent and, in doing so, we must presume parties intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise.
>
> Contract terms cannot be viewed in isolation, however, because doing so distorts meaning. Accordingly, we must consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. Consistent with our long-established precedent that no one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions, a specific contract provision controls over a general one.

*Id.*, at 888-89 (internal quotations, punctuation, and footnotes omitted).

B.  Effectiveness of Saum's Revocation.  We first consider whether the contract was not "fully executed" without the Mayor's signature.  If so, then Saum's revocation was

made prior to the time the contract was executed. When a party contracts with a governmental entity, such as a city or municipality, we must consider not only the terms of the contract but any applicable statutory provisions as well as the common law. *See M.E.N. Water Supply Corp. v. City of Corsicana*, 564 S.W.3d 474, 487 (Tex. App.—Waco 2018, pet. denied). Neither party has identified any statutory or common law provisions that require a city mayor's signature before a contract with a city is "fully executed."

Beyond any statutory requirements, the authority to enter into contracts may be dictated by various documents adopted by a governmental entity for its own governance, such as city ordinances, charters, by-laws, or resolutions. *See Hous. Auth. of City of Dallas v. Killingsworth*, 331 S.W.3d 806, 811 (Tex. App.—Dallas 2011, pet. denied). Generally, cities "can express and bind themselves only by way of a duly assembled meeting." *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 757 (Tex. 2003) (citing *Cent. Power & Light Co. v. City of San Juan*, 962 S.W.2d 602, 612 (Tex. App.—Corpus Christi 1998, pet. dism'd w.o.j.)).

> The only way that a political subdivision of the state can act is by and through its governing body. . . . It is a well-settled rule that the governing authorities of cities can express themselves and bind the cities only by acting together in a meeting duly assembled. A city council can transact a city's business transactions only by resolution or ordinance, by majority rule of the council. A city's governing body may not delegate the right to make decisions affecting the transaction of city business. The governing body is authorized to delegate the right to perform acts and duties necessary to the transaction of the city's business, but can do so only by resolution or ordinance, by a majority vote.

*Cent. Power & Light*, 962 S.W.2d at 612-13 (citations omitted).

When a city adopts a charter, "that instrument becomes the fundamental law of the municipality in the same manner that the constitution is the fundamental law of the state." *Sierra Club v. Austin Ind. Sch. Dist.*, 489 S.W.2d 325, 332 (Tex. Civ. App.—Austin 1972, *rev'd on other grounds*, 495 S.W.2d 878 (Tex. 1973)). "The only limitation upon these powers is that the charter may not be in conflict with general laws of the state or in contravention of the constitution." *Cent. Power & Light*, 962 S.W.2d at 612 (citing *Forwood v. City of Taylor*, 147 Tex. 161, 214 S.W.2d 282, 286 (1948)).

The City has provided excerpts from the City's Articles of Incorporation as an exhibit to its brief. The articles of incorporation establish a "council-manager government" that vests all powers of the City with the City Council, including the power to "contract and be contracted with" and "to acquire property. . . ." College Station, Tex., Articles of Incorporation, art. I, § 2 and art. II, § 5 (as amended Nov. 6, 2012).

The powers of the Mayor are outlined in article III, §§ 17 and 20, which provide:

> The Mayor shall be the presiding officer of the City Council and shall be recognized as the head of the City government for all ceremonial purposes and by the Governor for purposes of military law, *but shall have no regular administrative duties*. The Mayor shall be entitled to vote on all matters under consideration by the City Council.

*Id.*, at art. III, § 17(b) (emphasis added).

> The Mayor shall preside at meetings of the City Council and shall be recognized as head of the City government for all ceremonial purposes and by the governor for purposes of military law, *but shall have no regular administrative duties*. The Mayor shall be entitled to vote upon all matters considered by the City Council, *but shall have no veto power*.

*Id.*, at art. III, § 20 (emphasis added).

Neither party identifies any other grant of power to the Mayor. The trial court could have concluded that the Mayor had no legal authority to contract on the City's behalf; therefore, his signature was not required before the contract was fully executed by the City.

The City requests that we take judicial notice of a resolution applicable in this case that is also analyzed in Saum's reply brief.[1] The resolution provides that the City Manager has the authority "to execute all contracts on behalf of the City when City Council has duly approved such contracts." College Station, Tex. Resolution No. 02-23-12-2d, Part 2 (Feb. 23, 2012). The resolution further provides:

> That the City Council hereby finds that granting such authority to the City Manager in no way precludes the Mayor from executing contracts on behalf of the City when City Council has duly approved such contracts if required by law or as a condition of the contract or as otherwise determined by the City Council in its discretion.

*Id.*, Part 3. The resolution additionally notes that granting the authority to the City Manager "shall not otherwise modify or change the City's procedures for processing such contracts." *Id.*, Part 4.

The Mayor testified that City Council approval is "absolutely necessary" for the execution of any contract and that the "next step" is his signature. Although he testified that his signature is placed on such contracts, he did not testify that his signature is

---

[1] We may take judicial notice of municipal ordinances. *See* TEX. R. EVID. 204.

required or necessary to "execute" a contract. "Statements or acts of the mayor or other officers or governing body members are ineffectual." *City of Bonham v. Sw. Sanitation, Inc.*, 871 S.W.2d 765, 767 (Tex. App.—Texarkana 1994, writ denied). *See also Test Masters Educational Services, Inc. v. Houston Ind. Sch. Dist.*, No. 14-02-00237-CV, 2003 WL 21911120, at *3 (Tex. App.—Houston [14th Dist.] Aug. 12, 2003, no pet.) (mem. op.) ("Statements or acts of individuals, not acting corporately as a body, are ineffectual.").

Saum has identified no other ordinance or other decree adopted by the City that gives the Mayor the authority to execute contracts on behalf of the City of College Station in general or as to the contract at issue in this case.

As the Mayor can only act within the limits of his authority, the trial court could have concluded that only the City Council's vote renders a contract "fully executed." *See City of Houston v. Petroleum Traders Corp.*, 261 S.W.3d 350, 358 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *see also City of Houston v. Clear Channel Outdoor, Inc.*, 233 S.W.3d 441, 446 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (contract document and City Council's passage of accompanying motion constituted "the last step needed to complete the written contract between the parties.").[2]

---

[2] These two cases are particularly compelling because both panels found that the contracts at issue were fully executed when the City of Houston approved them, even though the city charter specifically provided that no contract would be binding upon the city unless it was signed by the mayor and countersigned by the controller.

The plain meaning of the word "execute" supports a determination that the authority of the Mayor or City Manager "to execute" a contract differs from the authority of the City Council "to execute" a contract. "Execute," as related to the City Council, means "to complete or make valid . . . as by signing, sealing, and delivering." *Execute*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed. 1999). "Execute," as related to the Mayor or City Manager, means "to follow out or carry out; do; perform; fulfill/to execute another's order. . . ." *Id.* The trial court could reasonably have concluded that the Mayor's signature was not required to "execute" the contract in the sense of finalizing it or otherwise making it valid.

"[P]ersons or entities contracting with governmental units are charged by law with notice of the limits of the authority of the governmental unit and are bound at their peril to ascertain if the contemplated contract is properly authorized." *Base-Seal, Inc. v. Jefferson Cty.*, 901 S.W.2d 783, 788 (Tex. App.—Beaumont 1995, writ denied); *see also Test Masters*, 2003 WL 21911120, at *3. The trial court could have concluded that Saum was on notice that the Mayor had no authority to contract on the City's behalf.

If a specific signature was needed beyond the City Council's approval, the trial court could have determined that the signature of the City Manager was sufficient to "fully execute" the contract on the City's behalf as the City Manager is specifically given the authority to execute contracts on behalf of the City. The approval of the City Council and the signature of the City Manager were completed prior to Saum's attempted

revocation of her acceptance of the contract. The trial court could have concluded that the contract was "fully executed" by either the City Council's vote adopting the contract or by the City Manager's signature. Because the Mayor's signature was not required, the trial court did not abuse its discretion in finding that Saum's revocation was ineffective as it occurred subsequent to the contract being "fully executed" by adoption of the City Council. Saum's third issue is overruled.

C. Signatures Required by Mutual Consent. The next question is whether the parties mutually agreed that the contract required the Mayor's signature in order for the contract to be "fully executed." Texas law recognizes that a contract need not be signed to be "executed" unless the parties explicitly require signatures as a condition of mutual assent. *Phillips v. Carlton Energy Group, LLC*, 475 S.W.3d 265, 277 (Tex. 2015) (citing *Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 157 (Tex. 2010)). We look to the language of the contract and other manifestations of the parties' intentions.

The contract provides: "This Real Estate Contract by BUYER to purchase the PROPERTY is subject to approval by the City Council of the City of College Station, Texas; such approval indicated by signature of BUYER'S representatives to this Contract." The trial court could have determined that this language indicates that the City Council's approval is paramount to the "execution" of the contract and that any signatures by the City's representatives are merely a manifestation of that approval.

Saum points to other sections in the contract that she believes indicate that the terms "executed" and "signed" have the same meaning. Article IX, Section 9.4 of the contract, entitled "Parties Bound," provides:

> This Contract shall be binding upon and inure to the benefits of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns. The persons executing this Contract do so in their capacities as set forth below and in no other capacity whatsoever, and such persons shall have no personal liability for executing this Contract in a representative capacity. All such liability is limited to the principal for which they execute this document as a representative.

The trial court could have determined that this section relieves the individual signatories from any personal liability on the contract, but that it does not make the execution of the contract contingent upon their signatures.

Saum also points to the date line immediately above the signatures of the Seller and the Buyer that notes that the contract is "EXECUTED on this the _____ day of _____, 2017." Handwritten into this line are "11th" and "September," the date the City Council voted to approve the contract. This line is not attached to or contingent upon the signatures of the City's representatives. The trial court could have concluded that this provision does not make the Mayor's signature a prerequisite for execution of the contract, but rather a manifestation of the date the City approved the contract.

Saum conflates the language "fully executed" in various letters passed between the parties during negotiations to indicate that the parties mutually agreed that the signature of the Mayor was required. The term "execute" has "several definitions and is

not strained by [Saum's] argument that 'to execute' may only mean 'to sign.'" *Mid-Continent Cas. Co.*, 323 S.W.3d at 157.

> Black's Law Dictionary defines "execute" as "[t]o perform or complete (a contract or duty) . . . [t]o change (as a legal interest) from one form to another . . . [or] [t]o make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form. . . ." BLACK'S LAW DICTIONARY (8th ed. 2004).

*Id*.

Reading all of the documents together, the trial court could reasonably have determined that the most important circumstance associated with the phrase "fully executed" remains the approval of the City Council and that the parties did not agree that signatures from the Mayor or other City representatives were required before the contract was executed. The trial court did not abuse its discretion in determining that the parties did not agree to require signatures as a condition of mutual consent. Saum's first issue is overruled.[3]

D. Delivery of Contract. Saum next argues that the contract was not "fully executed" because it was not delivered to her after the City Council approved it and before she revoked her approval. While "signature and delivery are often evidence of

---

[3] Saum asserts that the Statute of Frauds provides additional support for her argument that the signatures of both parties were required to "fully execute" the contract. Even assuming Saum's argument is correct, the Statute of Frauds was fulfilled when the City Manager signed the contract prior to Saum's attempted revocation. *See* TEX. BUS. & COM. CODE ANN. § 26.01(a)-(b) (a contract for the sale of real estate "is not enforceable unless the promise . . . is (1) in writing; and (2) signed by the person to be charged with the promise or agreement *or by someone lawfully authorized to sign for him*.") (emphasis added). The trial court could have determined that the statute of frauds was satisfied by the City Manager signing the contract prior to Saum's attempted revocation.

the mutual assent required for a contract, they are not essential." *Phillips*, 475 S.W.3d at 277 (citing *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007)). The trial court could have concluded that delivery was not required as a further manifestation of the parties' mutual assent to the contract. The trial court did not abuse its discretion in determining that the contract was valid even though a copy was not delivered to Saum before her attempted revocation. Saum's second issue is overruled.

### Conclusion

Having overruled all of Saum's issues, we affirm the trial court's order granting a temporary injunction.

REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Neill
     (Chief Justice Gray concurring with a note)*
     (Justice Neill concurring without a note)**
Judgment affirmed
Opinion delivered and filed December 22, 2020
[CV06]

\* (Chief Justice Gray concurs in the Court's judgment. A separate opinion will not issue. However, he has provided the following note.

This is one of those proceedings where you feel like you must get up close to it to work on it. It is like working calves as a poor rancher: no squeeze chute, no vet, and no ropes. There are just a few family members from multiple generations. If you are the newest generation, you have to get in close, real close. You wind up with some of just about everything on you-- blood, snot, sweat, and, well all that other stuff too.

It is almost impossible to determine whether there is a "probable right of recovery," the second element the movant must prove to be entitled to a temporary injunction, while staying a suitable distance from deciding, or at least discussing, controverted issues still pending in the trial court. And to make that task even more difficult, this case is within an area of law where there are factual disputes about the offer and acceptance as well as legal questions about the construction/interpretation of a contract that are blended issues for a fact finder to decide and those which the court performs by deciding a question of law. Most of the Court's opinion is a pure merits discussion which I think could be avoided. Let me repeat myself: It is hard to not talk about the merits of the case when you are trying to determine if the trial court abused its discretion when it determined the movant has a probable right of recovery.

But in my analogy to working calves, I am not the newest generation. I am the most senior generation. Standing and merely watching, maybe mildly amused at the struggles of youth to capture the calf and hold it. But I am holding the razor-sharp knife, waiting until the situation is ready for my talent, which is to step in and make a quick, clean, cut before the calf is released. I am not working calves here. But I am trying to do this review in a way that what we say in the interlocutory appeal does not constrict the parties as they move forward to determine the merits-based issues in the trial court proceeding. The question thus framed for me to decide, is whether there is a view of the facts and the law that the trial court could have determined, based on the record before it, that the City was likely to prevail that is not an abuse of discretion. I am not restricted to an articulation of the trial court's theory in the order in the absence of formal finding of fact. I do not have to decide if the trial court's view is correct on the movant's ability to show facts, or that the trial court's view of the law, if I am even able to determine what it is, is correct. Rather, I must decide whether that theoretical view the trial court may have seen is so unreasonable as to be an abuse of discretion. We should do everything we can to avoid giving either side an advantage by the discussion of our decision on interlocutory appeal of the temporary injunction for a decision that will be forthcoming on the merits. There has not been a trial on the merits, so the merits of the facts and the proper application of the law remain to be decided.

But on the question, as defined above, I have identified a theory of the facts and the law that could allow the City of College Station to prevail, which if that is the view of the facts and the law that the trial court saw and thus granted the temporary injunction upon, I could not say that view was an abuse of discretion. This is true even though I would not have done so and strongly disagree with that view. Thus, I can concur in the Court's judgment but join no part of the opinion. But I hasten to add the theory that I

have identified is not the theory expressed in the trial court's temporary injunction order and upon which the Court's opinion apparently relies.

The trial court and this Court have discussed at length one aspect of the case that I feel I must address, which is the law regarding the approval of a contract by the City. I think the City has been successful in distracting the trial court and this Court from the real issue, which is, what are the terms of the offer to which Saum required the City of College Station to agree before she was bound to a contract to sell her property. If she made an offer that required Willie Nelson's signature on the contract before she would agree to be bound to sell her property to the City of College Station, she had the right to do that. And no amount of "approval" by the city council could create a binding contract until the condition precedent to Saum being bound by the contract has happened. Saum did not require the signature of such a grand and notable person as Willie Nelson on the document; she only required that the Mayor of the City of College Station sign it to have a contract thus binding her to sell her property to the City. She contends that was a term of her offer and that she revoked her offer before it was accepted pursuant to the terms of her offer.

With these comments Chief Justice Gray respectfully concurs in the Court's judgment, but not its opinion.)

**     (Justice Neill concurs without a separate opinion.)

